# UNITED STATES ET AL. *v.* RICHARDSON

No. 72–885.   Argued October 10, 1973—Decided June 25, 1974

*Solicitor General Bork* argued the cause for the United States et al. On the brief were former *Solicitor General Griswold, Assistant Attorney General Wood, Deputy Solicitor General Lacovara, Harriet S. Shapiro, Walter H. Fleischer,* and *William D. Appler.*

*Osmond K. Fraenkel* argued the cause for respondent. With him on the brief were *Melvin L. Wulf, Burt Neuborne,* and *James R. Kelley.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari in this case to determine whether the respondent has standing to bring an action as a federal taxpayer [1] alleging that certain provisions concerning public reporting of expenditures under the Central Intelligence Agency Act of 1949, 63 Stat. 208, 50

---

[1] Respondent's complaint alleged that he was "a member of the electorate, and a loyal citizen of the United States." At the same time, he states that he "does not challenge the formulation of the issue contained in the petition for certiorari." Brief for Respondent in Opposition to Pet. for Cert. 1. The question presented there was: "Whether a federal taxpayer has standing to challenge the provisions of the Central Intelligence Act which provide that appropriations to and expenditures by that Agency shall not be made public, on the ground that such secrecy contravenes Article I, section 9, clause 7 of the Constitution." Pet. for Cert. 2.

U. S. C. § 403a *et seq.*, violate Art. I, § 9, cl. 7, of the Constitution which provides:

> "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time."

Respondent brought this suit in the United States District Court on a complaint in which he recites attempts to obtain from the Government information concerning detailed expenditures of the Central Intelligence Agency. According to the complaint, respondent wrote to the Government Printing Office in 1967 and requested that he be provided with the documents "published by the Government in compliance with Article I, section 9, clause (7) of the United States Constitution." The Fiscal Service of the Bureau of Accounts of the Department of the Treasury replied, explaining that it published the document known as the Combined Statement of Receipts, Expenditures, and Balances of the United States Government. Several copies of the monthly and daily reports of the office were sent with the letter. Respondent then wrote to the same office and, quoting part of the CIA Act, asked whether this statute did not "cast reflection upon the authenticity of the Treasury's Statement." He also inquired as to how he could receive further information on the expenditures of the CIA. The Bureau of Accounts replied stating that it had no other available information.

In another letter, respondent asserted that the CIA Act was repugnant to the Constitution and requested that the Treasury Department seek an opinion of the Attorney General. The Department answered declining to seek such an opinion and this suit followed. Respondent's complaint asked the court to "issue a perma-

nent injunction enjoining the defendants from publishing their 'Combined Statement of Receipts, Expenditures and Balances of the United States Government' and representing it as the fulfillment of the mandates of Article I Section 9 Clause 7 until same fully complies with those mandates." [2]   In essence, the respondent asked the federal court to declare unconstitutional that provision of the Central Intelligence Agency Act which permits the Agency to account for its expenditures "solely on the certificate of the Director . . . ."   50 U. S. C. § 403j (b). The only injury alleged by respondent was that he "cannot obtain a document that sets out the expenditures and receipts" of the CIA but on the contrary was "asked to accept a fraudulent document."   The District Court granted a motion for dismissal on the ground respondent lacked standing under *Flast* v. *Cohen,* 392 U. S. 83 (1968), and that the subject matter raised political questions not suited for judicial disposition.

The Court of Appeals sitting en banc, with three judges dissenting, reversed, 465 F. 2d 844 (CA3 1972), holding that the respondent had standing to bring this action.[3]   The majority relied chiefly on *Flast* v. *Cohen,*

---

[2] App. 15–16.  Respondent's complaint also asked for a three-judge district court and this application was denied by a single District Judge with directions to place the case on the calendar in the usual manner.  The Court of Appeals, in the judgment under review, ordered that, on remand, the case be considered by a three-judge court.  The District Court has granted a stay of respondent's motion to convene a three-judge court, pending disposition of this petition for writ of certiorari.  On September 26, 1972, the Third Circuit denied a petition for mandamus, filed by respondent, to compel the immediate convening of a three-judge court.

[3] The majority found that the respondent had standing to bring this suit as a taxpayer.  One judge held that he had standing as a citizen.  This case was originally argued before a panel consisting of two Circuit Judges and one District Judge sitting by designa-

170

*supra,* and its two-tier test that taxpayer standing rests on a showing of (a) a "logical link" between the status as a taxpayer and the challenged legislative enactment, *i. e.,* an attack on an enactment under the Taxing and Spending Clause of Art. I, § 8, of the Constitution; and (b) a "nexus" between the plaintiff's status and a specific constitutional limitation imposed on the taxing and spending power. 392 U. S., at 102–103. While noting that the respondent did not directly attack an appropriations act, as did the plaintiff in *Flast,* the Court of Appeals concluded that the CIA statute challenged by the respondent was "integrally related," 465 F. 2d, at 853, to his ability to challenge the appropriations since he could not question an appropriation about which he had no knowledge. The Court of Appeals seemed to rest its holding on an assumption that this case was a prelude to a later case challenging, on the basis of information obtained in this suit, some particular appropriation for or expenditure of the CIA; respondent stated no such an intention in his complaint. The dissenters took a different approach urging denial of standing principally because, in their view, respondent alleged no specific injury but only a general interest common to all members of the public.

We conclude that respondent lacks standing to maintain a suit for the relief sought and we reverse.

---

tion. After a second round of briefs, the Court of Appeals determined *sua sponte* to hear the case en banc without further argument. The District Judge sat with the Court of Appeals en banc. This point was not raised in the question presented in the petition for certiorari but the Solicitor General, in a footnote, called attention to the District Judge's participation. He expressed the view that, although 28 U. S. C. § 46 (c) limits en banc hearings to circuit judges in active service (and any retired circuit judge who participated in the initial hearing), the error was harmless. Brief for United States 5–6, n. 4. In these circumstances we need not reach the question.

## I

As far back as *Marbury* v. *Madison,* 1 Cranch 137 (1803), this Court held that judicial power may be exercised only in a case properly before it—a "case or controversy" not suffering any of the limitations of the political-question doctrine, not then moot or calling for an advisory opinion. In *Baker* v. *Carr,* 369 U. S. 186, 204 (1962), this limitation was described in terms that a federal court cannot

> " 'pronounce any statute, either of a State or of the United States, void, because irreconcilable with the Constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies.' *Liverpool Steamship Co.* v. *Commissioners of Emigration,* 113 U. S. 33, 39."

Recently in *Association of Data Processing Service Organizations, Inc.* v. *Camp,* 397 U. S. 150 (1970), the Court, while noting that "[g]eneralizations about standing to sue are largely worthless as such," *id.,* at 151, emphasized that "[o]ne generalization is, however, necessary and that is that the question of standing in the federal courts is to be considered in the framework of Article III which restricts judicial power to 'cases' and 'controversies.' " [4]

Although the recent holding of the Court in *Flast* v. *Cohen, supra,* is a starting point in an examination of respondent's claim to prosecute this suit as a taxpayer, that case must be read with reference to its principal predecessor, *Frothingham* v. *Mellon,* 262 U. S. 447 (1923). In *Frothingham,* the injury alleged was that the congressional enactment challenged as unconstitutional would, if implemented, increase the complain-

---

[4] 397 U. S., at 151. See also K. Davis, Administrative Law Treatise § 22.09-6, p. 753 (Supp. 1970).

ant's future federal income taxes.[5]  Denying standing, the *Frothingham* Court rested on the "comparatively minute[,] remote, fluctuating and uncertain," *id.,* at 487, impact on the taxpayer, and the failure to allege the kind of direct injury required for standing.

> "The party who invokes the [judicial] power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally." *Id.,* at 488.

When the Court addressed the question of standing in *Flast,* Mr. Chief Justice Warren traced what he described as the "confusion" following *Frothingham* as to whether the Court had announced a constitutional doctrine barring suits by taxpayers challenging federal expenditures as unconstitutional or simply a policy rule of judicial self-restraint.  In an effort to clarify the confusion and to take into account intervening developments, of which class actions and joinder under the Federal Rules of Civil Procedure were given as examples, the Court embarked on "a fresh examination of the limitations upon standing to sue in a federal court and the application of those limitations to taxpayer suits." 392 U. S., at 94.  That re-examination led, however, to the holding that a "taxpayer will have standing *consistent with Article III* to invoke federal

---

[5] In *Frothingham,* the plaintiff sought to enjoin enforcement of the Federal Maternity Act of 1921, 42 Stat. 224, which provided for financial grants to States with programs for reducing maternal and infant mortality.  She alleged violation of the Fifth Amendment's Due Process Clause on the ground that the legislation encroached on an area reserved to the States.

judicial power when he alleges that congressional action under the taxing and spending clause is in derogation of those constitutional provisions *which operate to restrict the exercise of the taxing and spending power."* *Id.,* at 105–106. (Emphasis supplied.) In so holding, the Court emphasized that Art. III requirements are the threshold inquiry:

> "The 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness . . . upon which the court so largely depends for illumination of difficult constitutional questions.' " *Id.,* at 99, citing *Baker v. Carr,* 369 U. S., at 204.

The Court then announced a two-pronged standing test which requires allegations: (a) challenging an enactment under the Taxing and Spending Clause of Art. I, § 8, of the Constitution; and (b) claiming that the challenged enactment exceeds specific constitutional limitations imposed on the taxing and spending power. 392 U. S., at 102–103. While the "impenetrable barrier to suits against Acts of Congress brought by individuals who can assert only the interest of federal taxpayers," *id.,* at 85, had been slightly lowered, the Court made clear it was reaffirming the principle of *Frothingham* precluding a taxpayer's use of "a federal court as a forum in which to air his generalized grievances about the conduct of government or the allocation of power in the Federal System." *Id.,* at 106. The narrowness of that holding is emphasized by the concurring opinion of MR. JUSTICE STEWART in *Flast:*

> "In concluding that the appellants therefore have standing to sue, we do not undermine the salutary principle, established by *Frothingham* and reaffirmed

today, that a taxpayer may not 'employ a federal court as a forum in which to air his generalized grievances about the conduct of government or the allocation of power in the Federal System.' " *Id.*, at 114.

## II

Although the Court made it very explicit in *Flast* that a "fundamental aspect of standing" is that it focuses primarily on the *party* seeking to get his complaint before the federal court rather than "on the issues he wishes to have adjudicated," *id.*, at 99, it made equally clear that

> "in ruling on [taxpayer] standing, it is both appropriate and necessary to look to the substantive issues for another purpose, namely, to determine whether there is a logical nexus between the status asserted and the claim sought to be adjudicated." *Id.*, at 102.[6]

We therefore turn to an examination of the issues sought to be raised by respondent's complaint to determine whether he is "a proper and appropriate party to invoke federal judicial power," *ibid.*, with respect to those issues.

We need not and do not reach the merits of the constitutional attack on the statute; our inquiry into the "substantive issues" is for the limited purpose indicated above. The mere recital of the respondent's claims and an examination of the statute under attack demonstrate how far he falls short of the standing criteria of *Flast* and how neatly he falls within the *Frothingham*

---

[6] In some cases, the operative effect of this "look at the substantive issues" could lead to the conclusion that the "substantive issues" were nonjusticiable and in consequence no one would have standing. See *Gilligan* v. *Morgan*, 413 U. S. 1, 9 (1973); *Flast* v. *Cohen*, 392 U. S. 83, 95 (1968); *Poe* v. *Ullman*, 367 U. S. 497, 508–509 (1961).

holding left undisturbed. Although the status he rests on is that he is a taxpayer, his challenge is not addressed to the taxing or spending power, but to the statutes regulating the CIA, specifically 50 U. S. C. § 403j (b). That section provides different accounting and reporting requirements and procedures for the CIA, as is also done with respect to other governmental agencies dealing in confidential areas.[7]

Respondent makes no claim that appropriated funds are being spent in violation of a "specific constitutional limitation upon the . . . taxing and spending power . . . ." 392 U. S., at 104. Rather, he asks the courts to compel the Government to give him information on precisely how the CIA spends its funds. Thus there is no "logical nexus" between the asserted status of taxpayer and the claimed failure of the Congress to require the Executive to supply a more detailed report of the expenditures of that agency.[8]

The question presented thus is simply and narrowly whether these claims meet the standards for taxpayer standing set forth in *Flast;* we hold they do not. Respondent is seeking "to employ a federal court as a forum in which to air his generalized grievances about the conduct of government." 392 U. S., at 106. Both *Frothingham* and *Flast, supra,* reject that basis for standing.

---

[7] See 28 U. S. C. § 537 (Federal Bureau of Investigation); 31 U. S. C. § 107 (foreign affairs); 42 U. S. C. § 2017 (b) (Atomic Energy Commission).

[8] Congress has taken notice of the need of the public for more information concerning governmental operations, but at the same time it has continued traditional restraints on disclosure of confidential information. See Freedom of Information Act, 5 U. S. C. § 552; *Environmental Protection Agency* v. *Mink,* 410 U. S. 73 (1973).

## III

The Court of Appeals held that the basis of taxpayer standing

> "need not always be the appropriation and the spending of [taxpayer's] money for an invalid purpose. The personal stake may come from an injury in fact even if it is not directly economic in nature. Association of Data Processing Organizations, Inc. v. Camp, [397 U. S. 150,] 154 (1970)." 465 F. 2d, at 853.[9]

The respondent's claim is that without detailed information on CIA expenditures—and hence its activities—he cannot intelligently follow the actions of Congress or the Executive, nor can he properly fulfill his obligations as a member of the electorate in voting for candidates seeking national office.

This is surely the kind of a generalized grievance described in both *Frothingham* and *Flast* since the im-

---

[9] The Court of Appeals thus appeared to rely on *Association of Data Processing Service Organizations, Inc.* v. *Camp*, 397 U. S. 150 (1970). Abstracting some general language of that opinion from the setting and controlling facts of that case, the Court of Appeals overlooked the crucial factor that standing in that case arose under a specific statute, Bank Service Corporation Act of 1962, 76 Stat. 1132, 12 U. S. C. § 1861. The petitioners in *Data Processing* alleged competitive economic injury to private business enterprise due to a ruling by the Comptroller of the Currency permitting national banks to sell their data processing services to other banks and to bank customers whose patronage the data processing companies sought. We recognized standing for those private business proprietors who were engaged in selling the same kind of services the Comptroller allowed banks to sell; we held only that the claims of impermissible competition were "arguably . . . within the zone of interests protected" by § 4 of the Bank Service Corporation Act. 397 U. S., at 156. In short, Congress had provided competitor standing. The Court saw no indication that Congress had sought to preclude judicial review of *administrative rulings* of the Comptroller of the Currency as to the limitations Congress placed on national banks.

pact on him is plainly undifferentiated and "common to all members of the public." *Ex parte Lévitt,* 302 U. S. 633, 634 (1937); *Laird* v. *Tatum,* 408 U. S. 1, 13 (1972). While we can hardly dispute that this respondent has a genuine interest in the use of funds and that his interest may be prompted by his status as a taxpayer, he has not alleged that, as a taxpayer, he is in danger of suffering any particular concrete injury as a result of the operation of this statute. As the Court noted in *Sierra Club* v. *Morton,* 405 U. S. 727 (1972):

> "[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved' within the meaning of the APA." *Id.,* at 739.

*Ex parte Lévitt, supra,* is especially instructive. There Lévitt sought to challenge the validity of the commission of a Supreme Court Justice who had been nominated and confirmed as such while he was a member of the Senate. Lévitt alleged that the appointee had voted for an increase in the emoluments provided by Congress for Justices of the Supreme Court during the term for which he was last elected to the United States Senate. The claim was that the appointment violated the explicit prohibition of Art. I, § 6, cl. 2, of the Constitution.[10] The Court disposed of Lévitt's claim, stating:

> "It is an established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he *has sustained or is immedi-*

---

[10] "No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time . . . ."

*ately in danger of sustaining a direct injury* as the result of that action and it is not sufficient that he has merely a general interest common to all members of the public." 302 U. S., at 634. (Emphasis supplied.)

Of course, if Lévitt's allegations were true, they made out an arguable violation of an explicit prohibition of the Constitution. Yet even this was held insufficient to support standing because, whatever Lévitt's injury, it was one he shared with "all members of the public." Respondent here, like the petitioner in *Lévitt,* also fails to clear the threshold hurdle of *Baker* v. *Carr,* 369 U. S., at 204. See *supra,* at 171, and *Flast, supra.*[11]

---

[11] Although we need not reach or decide precisely what is meant by "a regular Statement and Account," it is clear that Congress has plenary power to exact any reporting and accounting it considers appropriate in the public interest. It is therefore open to serious question whether the Framers of the Constitution ever imagined that general directives to the Congress or the Executive would be subject to enforcement by an individual citizen. While the available evidence is neither qualitatively nor quantitatively conclusive, historical analysis of the genesis of cl. 7 suggests that it was intended to permit some degree of secrecy of governmental operations. The ultimate weapon of enforcement available to the Congress would, of course, be the "power of the purse." Independent of the statute here challenged by respondent, Congress could grant standing to taxpayers or citizens, or both, limited, of course, by the "cases" and "controversies" provisions of Art. III.

Not controlling, but surely not unimportant, are nearly two centuries of acceptance of a reading of cl. 7 as vesting in Congress plenary power to spell out the details of precisely when and with what specificity Executive agencies must report the expenditure of appropriated funds and to exempt certain secret activities from comprehensive public reporting. See 2 M. Farrand, The Records of the Federal Convention of 1787, pp. 618–619 (1911); 3 *id.,* at 326–327; 3 J. Elliot, Debates on the Federal Constitution 462 (1836); D. Miller, Secret Statutes of the United States 10 (1918).

It can be argued that if respondent is not permitted to litigate this issue, no one can do so. In a very real sense, the absence of any particular individual or class to litigate these claims gives support to the argument that the subject matter is committed to the surveillance of Congress, and ultimately to the political process. Any other conclusion would mean that the Founding Fathers intended to set up something in the nature of an Athenian democracy or a New England town meeting to oversee the conduct of the National Government by means of lawsuits in federal courts. The Constitution created a *representative* Government with the representatives directly responsible to their constituents at stated periods of two, four, and six years; that the Constitution does not afford a judicial remedy does not, of course, completely disable the citizen who is not satisfied with the "ground rules" established by the Congress for reporting expenditures of the Executive Branch. Lack of standing within the narrow confines of Art. III jurisdiction does not impair the right to assert his views in the political forum or at the polls. Slow, cumbersome, and unresponsive though the traditional electoral process may be thought at times, our system provides for changing members of the political branches when dissatisfied citizens convince a sufficient number of their fellow electors that elected representatives are delinquent in performing duties committed to them.

As our society has become more complex, our numbers more vast, our lives more varied, and our resources more strained, citizens increasingly request the intervention of the courts on a greater variety of issues than at any period of our national development. The acceptance of new categories of judicially cognizable injury has not eliminated the basic principle that to invoke judicial power the claimant must have a "personal stake in the outcome,"

*Baker* v. *Carr, supra,* at 204, or a "particular, concrete injury," *Sierra Club, supra,* at 740–741, n. 16, or "a direct injury," *Ex parte Lévitt, supra,* at 634; in short, something more than "generalized grievances," *Flast, supra,* at 106. Respondent has failed to meet these fundamental tests; accordingly, the judgment of the Court of Appeals is

*Reversed.*

[For dissenting opinion of MR. JUSTICE BRENNAN, see *post,* p. 235.]

MR. JUSTICE POWELL, concurring.

I join the opinion of the Court because I am in accord with most of its analysis, particularly insofar as it relies on traditional barriers against federal taxpayer or citizen standing. And I agree that *Flast* v. *Cohen,* 392 U. S. 83 (1968), which set the boundaries for the arguments of the parties before us, is the most directly relevant precedent and quite correctly absorbs a major portion of the Court's attention. I write solely to indicate that I would go further than the Court and would lay to rest the approach undertaken in *Flast.* I would not overrule *Flast* on its facts, because it is now settled that federal taxpayer standing exists in Establishment Clause cases. I would not, however, perpetuate the doctrinal confusion inherent in the *Flast* two-part "nexus" test. That test is not a reliable indicator of when a federal taxpayer has standing, and it has no sound relationship to the question whether such a plaintiff, with no other interest at stake, should be allowed to bring suit against one of the branches of the Federal Government. In my opinion, it should be abandoned.

I

My difficulties with *Flast* are several. The opinion purports to separate the question of standing from the merits, *id.,* at 99–101, yet it abruptly returns to

the substantive issues raised by a plaintiff for the purpose of determining "whether there is a logical nexus between the status asserted and the claim sought to be adjudicated." *Id.*, at 102. Similarly, the opinion distinguishes between constitutional and prudential limits on standing. *Id.*, at 92–94, 97. I find it impossible, however, to determine whether the two-part "nexus" test created in *Flast* amounts to a constitutional or a prudential limitation, because it has no meaningful connection with the Court's statement of the bare-minimum constitutional requirements for standing.

Drawing upon *Baker* v. *Carr,* 369 U. S. 186, 204 (1962), the Court in *Flast* stated the " 'gist of the question of standing' " as "whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' " 392 U. S., at 99. As the Court today notes, *ante,* at 173, this is now the controlling definition of the irreducible Art. III case-or-controversy requirements for standing.[1] But, as Mr. Justice Harlan pointed out

---

[1] See also, *e. g., Barlow* v. *Collins,* 397 U. S. 159, 170–171 (1970) (BRENNAN, J., dissenting); Scott, Standing in the Supreme Court—A Functional Analysis, 86 Harv. L. Rev. 645, 658 (1973). The test announced in *Baker* and reiterated in *Flast* reflects how far the Court has moved in recent years in relaxing standing restraints. In *Frothingham* v. *Mellon,* 262 U. S. 447 (1923), for example, the Court declared that to permit a federal taxpayer suit "would be not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which plainly we do not possess." *Id.*, at 489. And in denying standing to citizens and taxpayers seeking to bring suit to invalidate the Nineteenth Amendment in *Fairchild* v. *Hughes,* 258 U. S. 126 (1922), the Court stated:

"It is frankly a proceeding to have the Nineteenth Amendment declared void. In form it is a bill in equity; but it is not a case

in his dissent in *Flast*, 392 U. S., at 116 *et seq.*, it is impossible to see how an inquiry about the existence of "concrete adverseness" is furthered by an application of the *Flast* test.

*Flast* announced the following two-part "nexus" test:

"The nexus demanded of federal taxpayers has two aspects to it. First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. Thus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute. . . . Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8. When both nexuses are established, the litigant will have shown a taxpayer's stake in the outcome of the controversy and will be a proper and appropriate party to invoke a federal court's jurisdiction." *Id.*, at 102–103.

Relying on history, the Court identified the Establishment Clause as a specific constitutional limitation upon the exercise by Congress of the taxing and spending power within the meaning of § 2 of Article III of the Constitution . . . ." *Id.*, at 129.

conferred by Art. I, § 8.  392 U. S., at 103–105.  On the other hand, the Tenth Amendment, and apparently the Due Process Clause of the Fifth Amendment, were determined not to be such "specific" limitations.  The bases for these determinations are not wholly clear, but it appears that the Court found the Tenth Amendment addressed to the interests of the States, rather than of taxpayers, and the Due Process Clause no protection against increases in tax liability.  *Id.,* at 105.

In my opinion, Mr. Justice Harlan's critique of the *Flast* "nexus" test is unanswerable.  As he pointed out, "the Court's standard for the determination of standing [*i. e.,* sufficiently concrete adverseness] and its criteria for the satisfaction of that standard are entirely unrelated."  *Id.,* at 122.  Assuming that the relevant constitutional inquiry is the intensity of the plaintiff's concern, as the Court initially posited, *id.,* at 99, the *Flast* criteria "are not in any sense a measurement of any plaintiff's interest in the outcome of any suit."  *Id.,* at 121 (Harlan, J., dissenting).  A plaintiff's incentive to challenge an expenditure does not turn on the "unconnected fact" that it relates to a regulatory rather than a spending program, *id.,* at 122, or on whether the constitutional provision on which he relies is a "specific limitation" upon Congress' spending powers.  *Id.,* at 123.[2]

---

[2] Mr. Justice Harlan's criticisms of the Court's analysis in *Flast* have been echoed by several commentators.  *E. g.,* Scott, *supra,* n. 1, at 660–662; Davis, Standing: Taxpayers and Others, 35 U. Chi. L. Rev. 601, 604–607 (1968).  As Professor Scott notes:

"[The *Flast* 'nexus' test] can be understood as an expedient by a court retreating from the absolute barrier of *Frothingham,* but not sure of how far to go and desirous of a formula that would enable it to make case by case determinations in the future.  By any other standard, however, it is untenable."  86 Harv. L. Rev., at 661.

The ambiguities inherent in the *Flast* "nexus" limita-
tions on federal taxpayer standing are illustrated by this
case. There can be little doubt about respondent's fervor
in pursuing his case, both within administrative channels
and at every level of the federal courts. The intensity of
his interest appears to bear no relationship to the fact
that, literally speaking, he is not challenging directly a
congressional exercise of the taxing and spending power.
On the other hand, if the involvement of the taxing and
spending power has some relevance, it requires no great
leap in reasoning to conclude that the Statement and
Account Clause, Art. I, § 9, cl. 7, on which respondent
relies, is inextricably linked to that power. And that
Clause might well be seen as a "specific" limitation on
congressional spending. Indeed, it could be viewed as
the most democratic of limitations. Thus, although the
Court's application of *Flast* to the instant case is probably
literally correct, adherence to the *Flast* test in this in-
stance suggests, as does *Flast* itself, that the test is not
a sound or logical limitation on standing.

, The lack of real meaning and of principled content in
the *Flast* "nexus" test renders it likely that it will in time
collapse of its own weight, as MR. JUSTICE DOUGLAS pre-
dicted in his concurring opinion in that case. 392 U. S.,
at 107. This will present several options for the Court.
It may either reaffirm pre-*Flast* prudential limitations
on federal and citizen taxpayer standing; attempt new
doctrinal departures in this area, as would MR. JUSTICE
STEWART, *post,* at 203–204; or simply drop standing bar-
riers altogether, as, judging by his concurring opinion in
*Flast, supra,* and his dissenting opinion today, would MR.
JUSTICE DOUGLAS.[3] I believe the first option to be the

---

[3] But see *Scripps-Howard Radio, Inc.* v. *FCC,* 316 U. S. 4, 18,
20–21 (1942) (DOUGLAS, J., dissenting). MR. JUSTICE BRENNAN's

appropriate course, for reasons which may be emphasized by noting the difficulties I see with the other two. And, while I do not disagree at this late date with the *Baker* v. *Carr* statement of the constitutional indicia of standing, I further believe that constitutional limitations are not the only pertinent considerations.

## II

MR. JUSTICE STEWART, joined by MR. JUSTICE MAR-SHALL, would grant citizen or taxpayer standing under those clauses of the Constitution that impose on the Federal Government "an affirmative duty" to do something on behalf of its citizens and taxpayers. *Post,* at 203–204. Although he distinguishes between an affirmative constitutional duty and a "constitutional prohibition" for purposes of this case, *post,* at 202, it does not follow that MR. JUSTICE STEWART would deny federal taxpayer standing in all cases involving a constitutional prohibition, as his concurring opinion in *Flast* makes clear.[4] Rather, he would find federal taxpayer standing,

view, see *post,* at 237–238, that federal taxpayers are able to meet the "injury-in-fact" test that he articulated in *Barlow* v. *Collins,* 397 U. S., at 167–173, renders his position, for me at least, indistinguishable from that of MR. JUSTICE DOUGLAS. Furthermore, I think that MR. JUSTICE BRENNAN has modified the standard he identified in *Barlow* by finding it satisfied in this case. It is a considerable step from the "distinctive and discriminating" economic injury alleged in *Barlow,* see *id.,* at 172 n. 5, to the generalized interest of a taxpayer or citizen, as MR. JUSTICE BRENNAN appears to have acknowledged in his opinion in that case. *Ibid.*

[4] In *Flast* v. *Cohen,* 392 U. S. 83 (1968), MR. JUSTICE STEWART based his concurrence in the majority's opinion on the view that the Establishment Clause constitutes an explicit prohibition on the taxing and spending power:

"Because that clause plainly *prohibits* taxing and spending in aid of religion, every taxpayer can claim a personal constitutional right

and perhaps citizen standing, in all cases based on constitutional clauses setting forth an affirmative duty and in unspecified cases where the constitutional clause at issue may be seen as a plain or explicit prohibition.

For purposes of determining whether a taxpayer or citizen has standing to challenge the actions of the Federal Government, I fail to perceive a meaningful distinction between constitutional clauses that set forth duties and those that set forth prohibitions.[5]   In either instance, the relevant inquiry is the same—may a plaintiff, relying on nothing other than citizen or taxpayer status, bring suit to adjudicate whether an entity of the Federal Government is carrying out its responsibilities in conformance with the requirements of the Constitution?   A taxpayer's or citizen's interest in and willingness to pursue with vigor such a suit would not turn on whether the constitutional clause at issue imposed a duty on the Government to do something for him or prohibited the Government from doing something to him.   Prohibitions and duties in this context are opposite sides of the same coin.   Thus, I do not believe that the inquiry whether federal courts should entertain public actions is

---

not to be taxed for the support of a religious institution. The present case is thus readily distinguishable from *Frothingham* v. *Mellon*, 262 U. S. 447, where the taxpayer did not rely on an *explicit constitutional prohibition* but instead questioned the scope of the powers delegated to the national legislature by Article I of the Constitution." 392 U. S., at 114. (Emphasis supplied.)

[5] One commentator, who espouses a broadening of standing in what he refers to as "public actions," apparently shares this difficulty. See L. Jaffe, Judicial Control of Administrative Action 484 (1965):

"[The ability of a taxpayer or citizen to bring a public action] should not depend on whether the questioned official conduct is of a positive or negative character, that is, whether it consists of the performance of an improper act or the failure to fulfill a duty."

advanced by line drawing between affirmative duties and prohibitions.[6]

In short, in my opinion my Brother STEWART's view fails to provide a meaningful stopping point between an all-or-nothing position with regard to federal taxpayer or citizen standing. In this respect, it shares certain of the deficiencies of *Flast*. I suspect that this may also be true of any intermediate position in this area. MR. JUSTICE DOUGLAS correctly discerns, I think, that the alternatives here as a matter of doctrine are essentially bipolar. His preference is clear: "I would be as liberal in allowing taxpayers standing to object to . . . violations of the First Amendment as I would in granting standing to people to complain of any invasion

---

[6] Such an approach might well lead to problems of classification that would divert attention from the fundamental question of whether public actions are an appropriate matter for the federal courts. And, if distinctions between constitutional prohibitions and duties are to make a difference, there are certain to be some incongruous rules as to when such a public action may be brought. This is apparent when one attempts to categorize the provisions of the Constitution primarily addressed at limiting the powers of the National Government—Art. I, § 9, and the Bill of Rights. All of the clauses of Art. I, § 9, except the seventh, which is at issue here, are stated as prohibitions. In fact the seventh clause is in part a prohibition against expenditures of public money in the absence of appropriations and in part an affirmative duty to publish periodically an account of such expenditures. The rationale for according special treatment solely to one-half of Art. I, § 9, cl. 7, and not to the other and not to the remaining clauses of Art. I, § 9, is not immediately apparent.

The same observation may be made of the Bill of Rights. The First Amendment through the Fifth, the Eighth, and possibly the Tenth are stated in terms of prohibitions. The Sixth Amendment and portions of the Seventh can be classified as duties. The Ninth defies classification. Rational rules for standing in public actions are, it seems to me, unlikely to emerge from an effort to make the format of a particular Amendment determinative.

of their rights under the Fourth Amendment or the Fourteenth or under any other guarantee in the Constitution itself or in the Bill of Rights." *Flast* v. *Cohen*, 392 U. S., at 114 (concurring opinion). My view is to the contrary.

## III

Relaxation of standing requirements is directly related to the expansion of judicial power.[7] It seems to me inescapable that allowing unrestricted taxpayer or citizen standing would significantly alter the allocation of power at the national level, with a shift away from a democratic form of government. I also believe that repeated and essentially head-on confrontations between the life-tenured branch and the representative branches of government will not, in the long run, be beneficial to either. The public confidence essential to the former and the vitality critical to the latter may well erode if we do not exercise self-restraint in the utilization of our power to negative the actions of the other branches. We should be ever mindful of the contradictions that would arise if a democracy were to permit general oversight of the elected branches of government by a nonrepresentative, and in large measure insulated, judicial branch.[8] Moreover, the

---

[7] One commentator predicted this phenomenon and its possible implications at the outset of the past decade of dramatic changes in standing doctrine:

"[J]udicial power expands as the requirements of standing are relaxed. . . . [I]f the so-called public action . . . were allowed with respect to constitutional challenges to legislation, then the halls of Congress and of the state legislatures would become with regularity only Act I of any contest to enact legislation involving public officials in its enforcement or application. Act II would, with the usual brief interlude, follow in the courts. . . ." Brown, Quis Custodiet Ipsos Custodes?—The School-Prayer Cases, 1963 Sup. Ct. Rev. 1, 15–16.

[8] Cf. A. Bickel, The Least Dangerous Branch 122 (1962).

argument that the Court should allow unrestricted taxpayer or citizen standing underestimates the ability of the representative branches of the Federal Government to respond to the citizen pressure that has been responsible in large measure for the current drift toward expanded standing. Indeed, taxpayer or citizen advocacy, given its potentially broad base, is precisely the type of leverage that in a democracy ought to be employed against the branches that were intended to be responsive to public attitudes about the appropriate operation of government. "We must as judges recall that, as Mr. Justice Holmes wisely observed, the other branches of the Government 'are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts.' *Missouri, Kansas & Texas R. Co.* v. *May,* 194 U. S. 267, 270." *Flast* v. *Cohen,* 392 U. S., at 131 (Harlan, J., dissenting).

Unrestrained standing in federal taxpayer or citizen suits would create a remarkably illogical system of judicial supervision of the coordinate branches of the Federal Government. Randolph's proposed Council of Revision, which was repeatedly rejected by the Framers, at least had the virtue of being systematic; every law passed by the legislature automatically would have been previewed by the Judiciary before the law could take effect.[9] On the other hand, since the Judiciary cannot

---

[9] Randolph's Resolutions, also referred to as the Virginia Plan, served as the "matrix" for the document ultimately developed by the Constitutional Convention. See 1 J. Goebel, History of the Supreme Court of the United States 204 (1971). The eighth of Mr. Randolph's 15 proposals was as follows:

"8. Resd. that the Executive and a convenient number of the National Judiciary, ought to compose a council of revision with authority to examine every act of the National Legislature before it shall operate, & every act of a particular Legislature before a Negative thereon shall be final; and that the dissent of the said

select the taxpayers or citizens who bring suit or the nature of the suits, the allowance of public actions would produce uneven and sporadic review, the quality of which

Council shall amount to a rejection, unless the Act of the National Legislature be again passed, or that of a particular Legislature be again negatived by [an unspecified number] of the members of each branch." 1 M. Farrand, The Records of the Federal Convention of 1787, p. 21 (1911) (hereafter Farrand).

See 1 J. Elliot, Debates on the Federal Constitution 144 (1836). Madison ably supported the proposal, but it was defeated on three separate votes. 1 Farrand 140, 2 Farrand 71–72, 298.

The analogy between the proposed Council of Revision and unrestricted taxpayer or citizen standing is not complete. For example, Randolph proposed to link the Judiciary directly to the Executive, in large measure to enhance the Executive and to protect it from legislative encroachments. See, *e. g.*, 1 Farrand 108, 138; 2 Farrand 74, 79. Thus, reliance on the Framers' rejection of the Council must be approached with caution. Nevertheless, the arguments advanced at the Convention in support of and in opposition to the Council provide an interesting parallel to present contentions regarding unrestrained public actions. For example, Madison spoke of the " good". that would "proceed from the perspicuity, the conciseness, and the systematic character wch. the Code of laws wd. receive from the Judiciary talents." 1 Farrand 139. He declared that the proposal would be useful "to restrain the Legislature from encroaching on the other co-ordinate Departments, or on the rights of the people at large; or from passing laws unwise in their principle, or incorrect in their form . . . ," *ibid.*, and that such a system would be "useful to the Community at large as an additional check" against unwise legislative measures. 2 Farrand 74. Those opposed to the proposal, including Gerry, Martin, and Rutledge, preferred to rely "on the Representatives of the people as the guardians of their Rights & interests." *Id.*, at 75. Judges were not presumed "to possess any peculiar knowledge of the mere policy of public measures . . . ," *id.*, at 73, or any "higher . . . degree" of knowledge of mankind and of "Legislative affairs . . . ." *Id.*, at 76. It was "necessary that the Supreme Judiciary should have the confidence of the people . . . ," *id.*, at 76–77, and this would "soon be lost, if they are employed in the task of remonstrating

would be influenced by the resources and skill of the particular plaintiff. And issues would be presented in abstract form, contrary to the Court's recognition that "judicial review is effective largely because it is not available simply at the behest of a partisan faction, but is exercised only to remedy a particular, concrete injury." *Sierra Club* v. *Morton,* 405 U. S. 727, 740–741, n. 16 (1972).[10]

The power recognized in *Marbury* v. *Madison,* 1 Cranch 137 (1803), is a potent one. Its prudent use seems to me incompatible with unlimited notions of taxpayer and citizen standing. Were we to utilize this power as indiscriminately as is now being urged, we may witness efforts by the representative branches drastically to curb its use. Due to what many have regarded as the unresponsiveness of the Federal Government to recognized needs or serious inequities in our society, recourse to the federal courts has attained an unprecedented popularity in recent decades. Those courts have often acted as a major instrument of social reform. But this has not always been the case, as experiences under the New Deal illustrate. The public reaction to the substantive due process holdings of the federal courts during that period requires no elaboration, and it is not unusual for history to repeat itself.

---

agst. popular measures of the Legislature." *Id.,* at 77. Moreover, the "Judges ought never to give their opinion on a law till it comes before them." *Id.,* at 80.

The arguments adduced at the Convention in opposition to the Council of Revision ultimately prevailed. I believe that analogous arguments should guide us in refusing as a general matter to entertain public actions.

[10] Some Western European democracies have experimented with forms of constitutional judicial review in the abstract, see, *e. g.,* M. Cappelletti, Judicial Review in the Contemporary World 71–72 (1971), but that has not been our experience, and I think for good reasons. Cf. Bickel, *supra,* n. 8, at 115–116.

Quite apart from this possibility, we risk a progressive impairment of the effectiveness of the federal courts if their limited resources are diverted increasingly from their historic role to the resolution of public-interest suits brought by litigants who cannot distinguish themselves from all taxpayers or all citizens. The irreplaceable value of the power articulated by Mr. Chief Justice Marshall lies in the protection it has afforded the constitutional rights and liberties of individual citizens and minority groups against oppressive or discriminatory government action. It is this role, not some amorphous general supervision of the operations of government, that has maintained public esteem for the federal courts and has permitted the peaceful coexistence of the countermajoritarian implications of judicial review and the democratic principles upon which our Federal Government in the final analysis rests.

The considerations outlined above underlie, I believe, the traditional hostility of the Court to federal taxpayer or citizen standing where the plaintiff has nothing at stake other than his interest as a taxpayer or citizen. It merits noting how often and how unequivocally the Court has expressed its antipathy to efforts to convert the Judiciary into an open forum for the resolution of political or ideological disputes about the performance of government. See, *e. g., Ex parte Lévitt,* 302 U. S. 633, 634 (1937); [11] *Frothingham* v. *Mellon,* 262 U. S. 447, 488 (1923); [12] *Fairchild* v. *Hughes,* 258 U. S. 126, 129

---

[11] "It is an established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action and it is not sufficient that he has merely a general interest common to all members of the public."

[12] "The party who invokes the power [of the Judiciary to declare a statute unconstitutional] must be able to show not only that the

(1922); [13] *Tyler* v. *Judges of Court of Registration,* 179 U. S. 405, 406 (1900).[14]  These holdings and declarations reflect a wise view of the need for judicial restraint if we are to preserve the Judiciary as the branch "least dangerous to the political rights of the Constitution . . . ." Federalist No. 78, p. 483 (Lodge ed. 1908).

To be sure standing barriers have been substantially lowered in the last three decades.  The Court has confirmed the power of Congress to open the federal courts to representatives of the public interest through specific statutory grants of standing.  *E. g., FCC* v. *Sanders Bros. Radio Station,* 309 U. S. 470 (1940); *Scripps-Howard Radio, Inc.* v. *FCC,* 316 U. S. 4 (1942); *Flast* v. *Cohen,* 392 U. S., at 130–133 (Harlan, J., dissenting); *Trafficante* v. *Metropolitan Life Insurance Co.,* 409 U. S. 205, 212 (1972) (WHITE, J., concurring).  Even in the absence of specific statutory grants of standing, economic interests that at one time would not have conferred standing have been re-examined and found sufficient.  Compare, *e. g., Association of Data Processing Service Organizations, Inc.* v. *Camp,* 397 U. S. 150 (1970), and

---

statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally."

[13] "[Standing will be denied where a plaintiff] has only the right, possessed by every citizen, to require that the Government be administered according to law and that the public moneys be not wasted."

[14] "Save in a few instances where, by statute or the settled practice of the courts, the plaintiff is permitted to sue for the benefit of another, he is bound to show an interest in the suit personal to himself, and even in a proceeding which he prosecutes for the benefit of the public, as, for example, in cases of nuisance, he must generally aver an injury peculiar to himself, as distinguished from the great body of his fellow citizens."

*Barlow* v. *Collins,* 397 U. S. 159 (1970), with, *e. g., Tennessee Electric Power Co.* v. *TVA,* 306 U. S. 118 (1939), and *Alabama Power Co.* v. *Ickes,* 302 U. S. 464 (1938). See also *Investment Co. Institute* v. *Camp,* 401 U. S. 617 (1971); *Arnold Tours, Inc.* v. *Camp,* 400 U. S. 45 (1970). Noneconomic interests have been recognized. *E. g., Baker* v. *Carr,* 369 U. S. 186 (1962); *Sierra Club* v. *Morton,* 405 U. S. 727 (1972). A stringently limited exception for federal taxpayer standing has been created. *Flast* v. *Cohen, supra.* The concept of particularized injury has been dramatically diluted. *E. g., United States* v. *SCRAP,* 412 U. S. 669 (1973).

The revolution in standing doctrine that has occurred, particularly in the 12 years since *Baker* v. *Carr, supra,* has not meant, however, that standing barriers have disappeared altogether. As the Court noted in *Sierra Club,* "broadening the categories of injury that may be alleged in support of standing is a different matter from abandoning the requirement that the party seeking review must himself have suffered an injury." 405 U. S., at 738. Accord, *Linda R. S.* v. *Richard D.,* 410 U. S. 614, 617 (1973).[15] Indeed, despite the diminution of standing requirements in the last decade, the Court has not broken with the traditional requirement that, in the absence of a specific statutory grant of the right of review, a plaintiff must allege some particularized injury that sets him apart from the man on the street.[16]

---

[15] See *ibid.:*

"Although the law of standing has been greatly changed in the last 10 years, we have steadfastly adhered to the requirement that, at least in the absence of a statute expressly conferring standing, federal plaintiffs must allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction." (Footnotes omitted.)

[16] For example, as the Court noted in *Sierra Club* v. *Morton,* 405

I recognize that the Court's allegiance to a requirement of particularized injury has on occasion required a reading of the concept that threatens to transform it beyond recognition. *E. g., Baker* v. *Carr, supra; Flast* v. *Cohen, supra.*[17] But despite such occasional digressions, the requirement remains, and I think it does so for the reasons outlined above. In recognition of those considerations, we should refuse to go the last mile toward abolition of standing requirements that is implicit in broadening the "precarious opening" for federal taxpayers created by *Flast,* see 392 U. S., at 116 (Fortas, J., concurring), or in allowing a citizen *qua* citizen to invoke the power of the federal courts to negative unconstitutional acts of the Federal Government.

U. S. 727 (1972), "if any group with a bona fide 'special interest' could initiate . . . litigation, it is difficult to perceive why any individual citizen with the same bona fide special interest would not also be entitled to do so." *Id.,* at 739–740. The clear implication is that allowing "any individual citizen with [a] . . . bona fide special interest" to trigger federal court litigation is à result to be avoided. All standing cases, even the most recent ones, include references to the need for particularized injury or similar language. None of them as yet has equated the interest of a taxpayer or citizen, suing in that status alone, with the particularized interest that standing doctrine has traditionally demanded. To take that step, it appears to me, would render the requirement of direct or immediate injury meaningless and would reduce the Court's consistent insistence on such an injury to mere talk.

[17] *Baker* v. *Carr* may have a special claim to *sui generis* status. It was perhaps a necessary response to the manifest distortion of democratic principles practiced by malapportioned legislatures and to abuses of the political system so pervasive as to undermine democratic processes. *Flast* v. *Cohen* may also have been a reaction to what appeared at the time as an immutable political logjam that included unsuccessful efforts to confer specific statutory grants of standing. See, *e. g.,* C. Wright, The Law of Federal Courts 40 (2d ed. 1970). Cf. 392 U. S., at 115–116 (Fortas, J., concurring).

In sum, I believe we should limit the expansion of federal taxpayer and citizen standing in the absence of specific statutory authorization to an outer boundary drawn by the *results* in *Flast* and *Baker* v. *Carr*. I think we should face up to the fact that *all* such suits are an effort "to employ a federal court as a forum in which to air . . . generalized grievances about the conduct of government or the allocation of power in the Federal System." *Flast* v. *Cohen*, 392 U. S., at 106. The Court should explicitly reaffirm traditional prudential barriers against such public actions.[18] My reasons for this view are rooted in respect for democratic processes and in the conviction that "[t]he powers of the federal judiciary

---

[18] The doctrine of standing has always reflected prudential as well as constitutional limitations. Indeed, it might be said that the correct reading of the *Flast* nexus test is as a prudential limit, given the *Baker* v. *Carr* definition of the constitutional bare minima. The same is undoubtedly true of, for example, the second test created in *Association of Data Processing Service Organizations, Inc.* v. *Camp*, 397 U. S. 150, 153 (1970)—"whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." See also *Barrows* v. *Jackson*, 346 U. S. 249, 255 (1953): "Apart from the [constitutional] requirement, this Court has developed a complementary rule of self-restraint for its own governance . . . which ordinarily precludes a person from challenging the constitutionality of state action by invoking the rights of others." See *Flast* v. *Cohen*, 392 U. S., at 120, 130–133 (Harlan, J., dissenting). Whatever may have been the Court's initial perception of the intent of the Framers, see n. 1, *supra*, it is now settled that such rules of self-restraint are not required by Art. III but are "judicially created overlays that Congress may strip away. . . ." G. Gunther & N. Dowling, Cases and Materials on Constitutional Law 106 (8th ed. 1970). But where Congress does so, my objections to public actions are ameliorated by the congressional mandate. Specific statutory grants of standing in such cases alleviate the conditions that make "judicial forbearance the part of wisdom." *Flast, supra,* at 132 (Harlan, J., dissenting) (footnote omitted).

will be adequate for the great burdens placed upon them only if they are employed prudently, with recognition of the strengths as well as the hazards that go with our kind of representative government." *Id.*, at 131 (Harlan, J., dissenting).

MR. JUSTICE DOUGLAS, dissenting.

I would affirm the judgment of the Court of Appeals on the "standing" issue. My views are expressed in my dissent to the *Schlesinger* case, *post*, p. 229, decided this day. There a citizen and taxpayer raised a question concerning the Incompatibility Clause of the Constitution which bars a person from "holding any Office under the United States" if he is a Member of Congress, Art. I, § 6, cl. 2. That action was designed to bring the Pentagon into line with that constitutional requirement by requiring it to drop "reservists" who were Members of Congress.

The present action involves Art. I, § 9, cl. 7, of the Constitution which provides:

> "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time."

We held in *Flast* v. *Cohen,* 392 U. S. 83, that a taxpayer had "standing" to challenge the constitutionality of taxes raised to finance the establishment of a religion contrary to the command of the First and Fourteenth Amendments. A taxpayer making such outlays, we held, had sufficient "personal stake" in the controversy, *Baker* v. *Carr,* 369 U. S. 186, 204, to give the case the "concrete adverseness" necessary for the resolution of constitutional issues. *Ibid.*

Respondent in the present case claims that he has

a right to "a regular statement and account" of receipts and expenditures of public moneys for the Central Intelligence Agency. As the Court of Appeals noted, *Flast* recognizes "standing" of a taxpayer to challenge appropriations made in the face of a constitutional prohibition, and it logically asks, "how can a taxpayer make that challenge unless he knows how the money is being spent?" 465 F. 2d 844, 853.

History shows that the curse of government is not always venality; secrecy is one of the most tempting coverups to save regimes from criticism. As the Court of Appeals said:

> "The Framers of the Constitution deemed fiscal information essential if the electorate was to exercise any control over its representatives and meet their new responsibilities as citizens of the Republic; and they mandated publication, although stated in general terms, of the Government's receipts and expenditures. Whatever the ultimate scope and extent of that obligation, its elimination generates a sufficient, adverse interest in a taxpayer." *Ibid.* (Footnote omitted.)

Whatever may be the merits of the underlying claim, it seems clear that the taxpayer in the present case is not making a generalized complaint about the operation of Government. He does not even challenge the constitutionality of the Central Intelligence Agency Act. He only wants to know the amount of tax money exacted from him that goes into CIA activities. Secrecy of the Government acquires new sanctity when his claim is denied. Secrecy has, of course, some constitutional sanction. Article I, § 5, cl. 3, provides that "Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy . . . ."

But the difference was great when it came to an accounting of public money. Secrecy was the evil at which Art. I, § 9, cl. 7, was aimed. At the Convention, Mason took the initiative in moving for an annual account of public expenditures. 2 M. Farrand, The Records of the Federal Convention of 1787, p. 618 (1911). Madison suggested it be "from time to time," *id.*, at 618–619, because it was thought that requiring publication at fixed intervals might lead to no publication at all. Indeed under the Articles of Confederation "[a] punctual compliance being often impossible, the practice ha[d] ceased altogether." *Id.*, at 619.

During the Maryland debates on the Constitution, McHenry said: "[T]he People who give their Money ought to know in what manner it is expended," 3 Farrand, *supra*, at 150. In the Virginia debates Mason expressed his belief that while some matters might require secrecy (*e. g.*, ongoing diplomatic negotiations and military operations) "he did not conceive that the receipts and expenditures of the public money ought ever to be concealed. The people, he affirmed, had a right to know the expenditures of their money." 3 J. Elliot, Debates on the Federal Constitution 459 (1836). Lee said that the clause "must be supposed to mean, in the common acceptation of language, short, convenient periods" and that those "who would neglect this provision would disobey the most pointed directions." *Ibid.* Madison added that an accounting from "time to time" insured that the accounts would be "more full and satisfactory to the public, and would be sufficiently frequent." *Id.*, at 460. Madison thought "this provision went farther than the constitution of any state in the Union, or perhaps in the world." *Ibid.* In New York, Livingston said: "Will not the representatives . . . consider it as essential to their popularity, to gratify their con-

200

stituents with full and frequent statements of the public accounts? There can be no doubt of it," 2 Elliot, *supra*, at 347.*

From the history of the clause it is apparent that the Framers inserted it in the Constitution to give the public knowledge of the way public funds are expended. No one has a greater "personal stake" in policing this protective measure than a taxpayer. Indeed, if a taxpayer may not raise the question, who may do so? The Court states that discretion to release information is in the first instance "committed to the surveillance of Congress," and that the right of the citizenry to information under Art. I, § 9, cl. 7, cannot be enforced directly, but only through the "[s]low, cumbersome, and unresponsive" electoral process. One has only to read constitutional history to realize that statement would shock Mason and Madison. Congress of course has discretion; but to say that it has the power to read the clause out of the Consti-

---

*Livingston used the proposed Art. I, § 9, cl. 7, to combat the idea that the new Congress would be corrupt. He said in part:

"You will give up to your state legislatures everything dear and valuable; but you will give no power to Congress, because it may be abused; you will give them no revenue, because the public treasures may be squandered. But do you not see here a capital check? Congress are to publish, from time to time, an account of their receipts and expenditures. These may be compared together; and if the former, year after year, exceed the latter, the corruption will be detected, and the people may use the constitutional mode of redress. The gentleman admits that corruption will not take place immediately: its operations can only be conducted by a long series and a steady system of measures. These measures will be easily defeated, even if the people are unapprized of them. They will be defeated by that continual change of members, which naturally takes place in free governments, arising from the disaffection and inconstancy of the people. A changeable assembly will be entirely incapable of conducting a system of mischief; they will meet with obstacles and embarrassments on every side." 2 Elliot, *supra*, at 345–346.

tution when it comes to one or two or three agencies is astounding. That is the bare-bones issue in the present case. Does Art. I, § 9, cl. 7, of the Constitution permit Congress to withhold "a regular Statement and Account" respecting any agency it chooses? Respecting all federal agencies? What purpose, what function is the clause to perform under the Court's construction? The electoral process already permits the removal of legislators for any reason. Allowing their removal at the polls for failure to comply with Art. I, § 9, cl. 7, effectively reduces that clause to a nullity, giving it no purpose at all.

The sovereign in this Nation is the people, not the bureaucracy. The statement of accounts of public expenditures goes to the heart of the problem of sovereignty. If taxpayers may not ask that rudimentary question, their sovereignty becomes an empty symbol and a secret bureaucracy is allowed to run our affairs.

The resolution of that issue has not been entrusted to one of the other coordinate branches of government— the test of the "political question" under *Baker* v. *Carr,* 369 U. S., at 217. The question is "political" if there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department," *ibid.* The mandate runs to the Congress and to the agencies it creates to make "a regular Statement and Account of the Receipts and Expenditures of all public Money." The beneficiary—as is abundantly clear from the constitutional history—is the public. The public cannot intelligently know how to exercise the franchise unless it has a basic knowledge concerning at least the generality of the accounts under every head of government. No greater crisis in confidence can be generated than today's decision. Its consequences are grave because it relegates to secrecy vast operations of government and keeps the

public from knowing what secret plans concerning this Nation or other nations are afoot. The fact that the result is serious does not, of course, make the issue "justiciable." But resolutions of any doubts or ambiguities should be toward protecting an individual's stake in the integrity of constitutional guarantees rather than turning him away without even a chance to be heard.

I would affirm the judgment below.

MR. JUSTICE STEWART, with whom MR. JUSTICE MARSHALL joins, dissenting.

The Court's decisions in *Flast* v. *Cohen,* 392 U. S. 83 (1968), and *Frothingham* v. *Mellon,* 262 U. S. 447 (1923), throw very little light on the question at issue in this case. For, unlike the plaintiffs in those cases, Richardson did not bring this action asking a court to invalidate a federal statute on the ground that it was beyond the delegated power of Congress to enact or that it contravened some constitutional prohibition. Richardson's claim is of an entirely different order. It is that Art. I, § 9, cl. 7, of the Constitution, the Statement and Account Clause, gives him a right to receive, and imposes on the Government a corresponding affirmative duty to supply, a periodic report of the receipts and expenditures "of all public Money." [1] In support of his standing to litigate this claim, he has asserted his status both as a taxpayer and as a citizen-voter. Whether the Statement and Account Clause imposes upon the Government an affirmative duty to supply the information requested and whether that duty runs to every taxpayer or citizen are questions that go to the substantive merits of this liti-

---

[1] "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time."

gation. Those questions are not now before us, but I think that the Court is quite wrong in holding that the respondent was without standing to raise them in the trial court.

Seeking a determination that the Government owes him a duty to supply the information he has requested, the respondent is in the position of a traditional Hohfeldian plaintiff.[2] He contends that the Statement and Account Clause gives him a right to receive the information and burdens the Government with a correlative duty to supply it. Courts of law exist for the resolution of such right-duty disputes. When a party is seeking a judicial determination that a defendant owes him an affirmative duty, it seems clear to me that he has standing to litigate the issue of the existence *vel non* of this duty once he shows that the defendant has declined to honor his claim. If the duty in question involved the payment of a sum of money, I suppose that all would agree that a plaintiff asserting the duty would have standing to litigate the issue of his entitlement to the money upon a showing that he had not been paid. I see no reason for a different result when the defendant is a Government official and the asserted duty relates not to the payment of money, but to the disclosure of items of information.

When the duty relates to a very particularized and explicit performance by the asserted obligor, such as the payment of money or the rendition of specific items of information, there is no necessity to resort to any extended analysis, such as the *Flast* nexus tests, in order to find standing in the obligee. Under such circumstances, the duty itself, running as it does from the defendant to the

---

[2] Jaffe, The Citizen as Litigant in Public Actions: The Non-Hohfeldian or Ideological Plaintiff, 116 U. Pa. L. Rev. 1033 (1968). See Hohfeld, Some Fundamental Legal Conceptions as Applied in Judicial Reasoning, 23 Yale L. J. 16 (1913).

plaintiff, provides fully adequate assurance that the plaintiff is not seeking to "employ a federal court as a forum in which to air his generalized grievances about the conduct of government or the allocation of power in the Federal System." *Flast, supra,* at 106. If such a duty arose in the context of a contract between private parties, no one would suggest that the obligee should be barred from the courts. It seems to me that when the asserted duty is, as here, as particularized, palpable, and explicit as those which courts regularly recognize in private contexts, it should make no difference that the obligor is the Government and the duty is embodied in our organic law. Certainly after *United States* v. *SCRAP,* 412 U. S. 669 (1973), it does not matter that those to whom the duty is owed may be many. "[S]tanding is not to be denied simply because many people suffer the same injury." *Id.,* at 687.

For example, the Freedom of Information Act creates a private cause of action for the benefit of persons who have requested certain records from a public agency and whose request has been denied. 5 U. S. C. § 552 (a) (3). The statute requires nothing more than a request and the denial of that request as a predicate to a suit in the district court. The provision purports to create a duty in the Government agency involved to make those records covered by the statute available to "any person." Correspondingly, it confers a right on "any person" to receive those records, subject to published regulations regarding time, place, fees, and procedure. The analogy, of course, is clear. If the Court is correct in this case in holding that Richardson lacks standing under Art. III to litigate his claim that the Statement and Account Clause imposes an affirmative duty that runs in his favor, it would follow that a person whose request under 5 U. S. C. § 552 has been denied would similarly lack standing under Art. III de-

spite the clear intent of Congress to confer a right of action to compel production of the information.

The issue in *Flast* and its predecessor, *Frothingham, supra,* related solely to the standing of a federal taxpayer to challenge allegedly unconstitutional exercises of the taxing and spending power. The question in those cases was under what circumstances a federal taxpayer whose interest stemmed solely from the taxes he paid to the Treasury "[would] be deemed to have the personal stake and interest that impart the necessary concrete adverseness to such litigation so that standing can be conferred on the taxpayer *qua* taxpayer consistent with the constitutional limitations of Article III." 392 U. S., at 101. But the "nexus" criteria developed in *Flast* were not intended as a litmus test to resolve all conceivable standing questions in the federal courts; they were no more than a response to the problem of taxpayer standing to challenge federal legislation enacted in the exercise of the taxing and spending power of Congress.

Richardson is not asserting that a taxing and spending program exceeds Congress' delegated power or violates a constitutional limitation on such power. Indeed, the constitutional provision that underlies his claim does not purport to limit the power of the Federal Government in any respect, but, according to Richardson, simply imposes an affirmative duty on the Government with respect to all taxpayers or citizen-voters of the Republic. Thus, the nexus analysis of *Flast* is simply not relevant to the standing question raised in this case.

The Court also seems to say that this case is not justiciable because it involves a political question. *Ante,* at 179. This is an issue that is not before us. The "Question Presented" in the Government's petition for certiorari was the respondent's "standing to challenge the provisions of the Central Intelligence Agency

Act which provide that appropriations to and expenditures by that Agency shall not be made public, on the ground that such secrecy contravenes Article I, section 9, clause 7 of the Constitution."[3] The issue of the justiciability of the respondent's claim was thus not presented in the petition for certiorari, and it was not argued in the briefs.[4] At oral argument, in response to questions about whether the Government was asking this Court to rule on the justiciability of the respondent's claim, the following colloquy occurred between the Court and the Solicitor General:

> "MR. BORK: . . . I think the Court of Appeals was correct that the political question issue could be resolved much more effectively if we were in the full merits of the case than we can at this stage. I think standing is all that really can be effectively discussed in the posture of the case now.

> •　　　•　　　•　　　•　　　•

> "Q: . . . [I]f we disagree with you on standing, the Government agrees then that the case should go back to the District Court?
> "MR. BORK: I think that is correct."

---

[3] The Court has often indicated that, except in the most extraordinary circumstances, it will not consider questions that have not been presented in the petition for certiorari. *E. g., General Talking Pictures Corp.* v. *Western Electric Co.,* 304 U. S. 175, 177–178 (1938); *National Licorice Co.* v. *NLRB,* 309 U. S. 350, 357 n. 2 (1940); *Irvine* v. *California,* 347 U. S. 128, 129 (1954) (opinion of Jackson, J.); *Mazer* v. *Stein,* 347 U. S. 201, 206 n. 5 (1954).

[4] The District Court dismissed the complaint on the alternative grounds of lack of standing and nonjusticiability (because the court thought that the question involved was a political one). The Court of Appeals reversed the standing holding, but concluded that the justiciability issue was so intertwined with the merits that it should await consideration of the merits by the District Court on remand. The Government then brought the case here on petition for certiorari.

The Solicitor General's answer was clearly right. "[W]hen standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable." *Flast, supra,* at 99–100.

On the merits, I presume that the Government's position would be that the Statement and Account Clause of the Constitution does not impose an affirmative duty upon it; that any such duty does not in any event run to Richardson; that any such duty is subject to legislative qualifications, one of which is applicable here; and that the question involved is political and thus not justiciable. Richardson might ultimately be thrown out of court on any one of these grounds, or some other. But to say that he might ultimately lose his lawsuit certainly does not mean that he had no standing to bring it.

For the reasons expressed, I believe that Richardson had standing to bring this action. Accordingly, I would affirm the judgment of the Court of Appeals.