**PRESIDIO BRIDGE COMPANY**

v.

**The SECRETARY OF STATE of the United States and the Department of State of the United States.**

**No. P–76–CA–17.**

United States District Court, W. D. Texas, Pecos Division.

July 24, 1978.

Ray Pearson, El Paso, Tex., for plaintiff.

Jamie C. Boyd, U. S. Atty., by Asst. U. S. Atty., Jeremiah Handy, San Antonio, Tex., for defendant.

## MEMORANDUM ORDER

SUTTLE, District Judge.

The Presidio Bridge Company ("the Company") has owned and operated the only toll bridge spanning the Rio Grande River between Presidio, Texas, and Ojinaga, Mexico, for fifty years. On July 26, 1976, the State Department issued a permit to Presidio County, Texas, allowing the county to construct a second bridge between Presidio and Ojinaga. Shortly thereafter, the Company brought this suit seeking a declaratory judgment that the permit is invalid.

Two separate theories form the basis for the complaint: first, that in issuing the permit the State Department failed to comply with the procedural requirements mandated by Executive Order 11423 and the International Bridge Act of 1972, 33 U.S.C. §§ 535 et seq.; and, second, that "the environmental assessment of the proposed bridge prepared by the [Department] and the related negative determinations were not prepared in accordance with the National Environmental Policy Act [NEPA], 42 U.S.C. Sections 432 [4321] et seq., and the procedures adopted by the Department of State to be followed to comply with federal environmental statutes." Jurisdiction is asserted to be vested in this court under 5 U.S.C. §§ 701, 702 and 28 U.S.C. § 1337. Because the nature of the suit requires the court to venture forth into what has been an unchartered area of the law, a review of the facts, statutes, and status of the suit are in order.

## I

### A.

The Bridge Act of 1906, 33 U.S.C. §§ 491–498, provided that "[w]hen after March 23, 1906, authority is granted by Congress to any persons to construct and maintain a bridge across or over any navigable waters of the United States" the bridge must be built in conformity with the provisions in the Act. 33 U.S.C. § 491. Obviously, one mandatory provision was to obtain "authority" from Congress to build a bridge in the first place. Congress gave P. D. Anderson, H. E. Dupay, and their successors and assigns consent to build and maintain a bridge between Presidio and Ojinaga on March 10, 1926. The Presidio Bridge Company took over operation of the bridge as the assignee of Anderson and Dupay December 9, 1927. Thirty years later the Republic of Mexico took control of the portion of the bridge located within Mexico; the Company has operated the American portion continuously from 1927.

In 1946 Congress amended the 1906 Act. The "General Bridge Act of 1946," 33 U.S.C. §§ 525–533, made life a bit easier for a prospective bridge builder by giving, in advance, Congressional consent "for the construction, maintenance, and operation of bridges and approaches thereto over the navigable waters of the United States" in accordance with the procedures detailed in the Act. 33 U.S.C. § 525(a). Thus, it was no longer necessary for a prospective builder to secure passage of a bill by Congress granting permission to build; that hurdle was eliminated—with one exception: § 531 provided that the Act "shall not be construed to authorize construction of any bridge which will connect the United States . . . with any foreign country." Bridges to Mexico, then, still needed passage of a bill by Congress if they were to be built.

This exception proved to be a constant irritant both to Congress and to prospective builders, and thus throughout the 1960's attempts were made to correct the situa-

tion. It is worthwhile to quote in some detail from the legislative history to what was to become the penultimate solution, the International Bridge Act of 1972, 33 U.S.C. §§ 535–535i:

## BACKGROUND

Since enactment of the General Bridge Act of 1946, which exempted international bridges from its application, Congress has had to give separate approval to some 30 such bridges. In the early 1960's, this situation, aggravated by local controversies between bridge entrepreneurs along the Rio Grande, led the Committee on Foreign Relations to explore other means of authorizing the construction of international bridges. *After extensive consultation with the executive departments primarily concerned with these questions, a draft of an omnibus bill was produced, which the committee and the Senate first approved in 1964. The same bill passed the Senate again in 1965 and in 1967, but was not finally enacted by the House.* It was reintroduced as S. 3578 in the 91st Congress, but no action was taken. On September 15, 1971, the executive branch submitted a new draft of legislation on which H.R. 15577 [the bill that became law] is largely based. [Emphasis added.]

1972 U.S.Code Cong. and Admin.News, pp. 3399–3400.

While Congress was attempting to reach an agreement on a bill, President Johnson issued Executive Order 11423 on August 16, 1968. That order, titled "Providing for the Performance of Certain Functions Heretofore Performed by the President with Respect to Certain Facilities Constructed and Maintained on the Borders of the United States," designated the Secretary of State "to receive all applications for permits for the construction . . . at the borders of the United States, of . . . (IV) bridges, to the extent that congressional authorization is not required." Executive Order 11423, § 1(a). As of August 16, 1968, Congressional authorization was still required for all international bridges; however, that authorization was in the process

of being secured. The order then provided an elaborate procedure for the Secretary to follow; it will be explored fully in Part III of this order.

As noted, Congress remedied the situation with passage of the 1972 act, of which two sections specifically concern the ability of a state or one of its political subdivisions to enter into agreements to build bridges between itself and Mexico:

§ 535a. Congressional consent to State agreements with Canada and Mexico; Secretary of State's approval of agreements

The consent of Congress is hereby granted for a State or a subdivision or instrumentality thereof to enter into agreements—

(1) with the Government of Canada, a Canadian Province, or a subdivision or instrumentality of either, in the case of a bridge connecting the United States and Canada, or

(2) with the Government of Mexico, a Mexican State, or a subdivision or instrumentality of either, in the case of a bridge connecting the United States and Mexico,

for the construction, operation, and maintenance of such bridge in accordance with the applicable provisions of this Act. The effectiveness of such agreement shall be conditioned on its approval by the Secretary of State.

§ 535b. Presidential approval; recommendations of Federal officials

No bridge may be constructed, maintained, and operated as provided in section 535 of this title unless the President has given his approval thereto. In the course of determining whether to grant such approval, the President shall secure the advice and recommendations of (1) the United States section of the International Boundary and Water Commission, United States and Mexico, in the case of a bridge connecting the United States and Mexico, and (2) the heads of such departments and agencies of the Federal Government as he deems appropriate to determine the necessity for such bridge.

In June, 1973, Presidio County applied to the Secretary to build the bridge that is in issue here. After filing the application, however, the County did not pursue it, choosing instead to enter into negotiations with the Company in an effort to purchase the existing bridge. On November 9, 1973, the Company received an amendment to its permit under 33 U.S.C. § 491, for the reconstruction of its bridge. Negotiations broke down in 1975 before an agreement could be reached. The County then began to actively seek approval of its application. For its part, the Mexican government made it clear that it did not care who ran the bridge, but that it would operate only one bridge on its side of the border; thus, approval of the County's permit would put the Company out of business.

The Company chose to actively oppose the County's application. A public hearing was held March 25, 1976, at the Company's request, regarding the application. Representatives from the Company appeared at the hearing and testified. On July 2, 1976, the State Department recommended that the application be approved. It then attempted to comply with the provisions of Executive Order 11423, § 1(f), *infra* ; and it actually issued the permit on July 26, 1976. The Company then filed this suit August 14, 1976.

**B.**

■■ The Government responded to the complaint with a motion to dismiss under Rule 12(b)(1), F.R.Civ.P., for lack of jurisdiction over the subject matter—more particularly, that the Company did not have standing to raise its claims—or, in the alternative, under Rule 12(b)(6) for failure to state a claim upon which relief could be granted. Oral argument on the motion was heard October 27, 1977, and the matter was taken under advisement.[1]

■ On March 9, 1978, the court issued an "Order Setting Schedule" in which it held that the Company had sufficient standing to assert the Bridge Act claim. In reaching that decision, however, the court found it necessary to consider various affidavits and exhibits outside the pleadings; therefore, it was required by Rule 12(b) to properly treat the (b)(6) motion as one for summary judgment governed by the provisions of Rule 56. *Carter v. Stanton*, 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1971). For reasons of time, the court elected to postpone any consideration of the NEPA issues and proceeded to set a schedule for the filing of motions for summary judgment, oppositions to the motions, and accompanying briefs.[2]

The government has filed its motion for summary judgment. It contends that the

1. A product of that hearing was an agreement by the parties that the plaintiff would file an amended complaint. The original complaint made no reference to the Bridge Act, but simply referred to NEPA and the Executive Order. Consequently, the Government asserted that there was no authorization for judicial review of the Secretary's decision. As this court noted in its March 9 order, *infra*, however, the amended complaint:

  . . . based on an alleged failure to comply with specific statutory guidelines—remove[d] any question surrounding the jurisdiction of this court to hear this suit. Although the Administrative Procedure Act has been held not to provide an independent grant of subject matter jurisdiction permitting judicial review of agency action, *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), it is clear that the Act does permit judicial review of agency actions whenever a complaint is keyed to a specific statutory mandate and there is no specific

provision in the statutory scheme that precludes review. *See Texas Acorn v. Texas Area 5 Health Systems Agency*, 559 F.2d 1019, 1022, n. 5 (5th Cir. 1977). No decision was ever reached concerning § 1337 jurisdiction, nor is it necessary to decide that question in order to resolve this suit. Nevertheless, the court notes that it is likely such jurisdiction exists. *See State of Delaware v. Bender*, 402 F.Supp. 1066 (D.Del.1975).

2. This is an important case—one that, due to the issues involved, deserves prompt resolution. Thus, once the court determined that the Bridge Act claim could not be resolved short of summary judgment, it decided to rule on that issue and let matters proceed. Ultimately, this seemed to insure swifter resolution of all issues than would issuing piecemeal rulings or delaying matters while the court attempted to find time to possibly resolve what appeared to be essentially a secondary issue in the case.

facts undisputably reveal that it has fully complied with all requirements of existing law. The Company opposes the motion on several grounds, not all of which are consistent with one another:

1. All affidavits filed in support of the motion should be stricken for failure to comply with Rule 56; once this is done, the facts (and law) are in accord with the Plaintiff's position;

2. there are material facts in issue, thus making decision by summary judgment inappropriate;

3. Executive Order 11423 does not apply to the International Bridge Act—therefore, proof that the Government complied with it is not dispositive of the suit;

4. the facts show that the Government did not comply with the procedures required by the Bridge Act;

5. there remains the question whether the decision to grant the permit was made in an "arbitrary and capricious manner";

6. granting the permit constituted "a taking of [the Company's] property without just compensation [therefore] an issue of constitutional dimension is raised confronting this court with several issues of fact upon which Plaintiff's rights depend."

This court believes that the Government is correct and that summary judgment should be granted in its favor.

## II

Turning its attention first to the unresolved NEPA claim, the court now finds that the Plaintiff does not have sufficient standing to assert it.

In order to establish sufficient standing to obtain judicial review of an agency action, a prospective plaintiff must demonstrate both that he has suffered an injury in fact and that his interest "is arguably within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1972). This latter requirement, as Justice Powell has explained it, means that "in the absence of a specific statutory grant of review, a plaintiff must allege some particularized injury that sets him apart from the man in the street." *United States v. Richardson*, 418 U.S. 166, 194, 94 S.Ct. 2940, 2955, 41 L.Ed.2d 678 (1974) (concurring opinion). The Company has demonstrated that it stands to suffer severe economic injury as a result of the Secretary's decision, and the court has previously found that this injury is sufficient to bring the Company within the zone of interests protected by the Bridge Act. It is not sufficient to bring it within the zone of interests protected by N.E.P.A. "The N.E.P.A. simply was not meant to be used as a device whereby plaintiffs with strictly economic interests would be allowed to thwart governmental activity under the guise of environmental interest." *Hiatt Grain & Feed, Inc. v. Bergland*, 446 F.Supp. 457, 487 (D.Kan.1978). *See Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Churchill Truck Lines, Inc. v. United States*, 533 F.2d 411 (8th Cir. 1976); *Clinton Community Hospital Corp. v. Southern Maryland Medical Center*, 510 F.2d 1037 (4th Cir. 1974), *cert. denied*, 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975); *Maddox v. Bradley*, 345 F.Supp. 1255 (N.D.Tex.1975); *cf. Robinson v. Knebel*, 550 F.2d 422 (8th Cir. 1977). The Company cannot demonstrate any concern for, or connection with, an environmental interest. And N.E.P.A. was not created to protect economic concerns. This claim must, therefore, be dismissed for lack of jurisdiction over the subject matter.

## III

Section 535a of the International Bridge Act gives Congressional approval for a state or its subdivision to enter into an agreement with the Government of Mexico for the construction of a bridge connecting the United States and Mexico "conditioned on its approval by the Secretary of State." Section 535b adds that no bridge may be constructed without Presidential approval and, before he can grant approval, the Pres-

ident must secure the advice and recommendations of "the United States section of the International Boundary and Water Commission, United States and Mexico, in the case of a bridge connecting the United States and Mexico," as well as "the heads of such departments and agencies of the Federal Government as he deems appropriate to determine the necessity for such bridge."

■ Executive Order 11423 provides that in accordance with 3 U.S.C. § 301[3] the Secretary of State is designated "to receive all applications for permits for the construction *at the borders of the United States*, of: (IV) *bridges*, to the extent that congressional authorization is not required." The questions facing this court are whether the Bridge Act can be read in conjunction with this Order and, if so, whether the terms of the Order were complied with when this particular permit was granted.

### A.

As the portion of the legislative history to the 1972 Act quoted in Part I of this order makes clear, throughout the middle and late 1960's, Congress and the Executive Branch were jointly involved in an ongoing attempt to simplify and clarify the process by which permits were granted. Indeed, a further glimpse at that history reveals that the stated purpose of the Act:

. . . follows that of the General Bridge Act of 1946, from which so-called international bridges were exempted. Like that Act, this bill gives advance consent to the construction of such bridges, subject to numerous conditions. . . . 1972 U.S.Code Cong. & Admin. News, p. 3399.

The Company argues, with a great deal of persuasiveness, that, regardless of the intent behind the 1972 Act—clearly, to place international bridges in a similar posture to domestic ones—Executive Order 11423 cannot fairly be said to apply. In short, "if Executive Order 11423 did not cover international bridges in 1968, it could not, without change, cover international bridges after the Bridge Act of 1972 was passed by Congress." The effect of the Order is capable of quite another construction, however.

This court believes that Executive Order 11423 must be read as a related document to the 1972 Act. As the emphasized language indicates, the Order was designed to cover border areas—areas that, at the time the Order was drafted, were still within the scope of Congressional domain. There were no bridges under this provision where Congressional authorization was not needed. If this be so, why include the language? The most obvious reason for the provision is the fact that a bill had been in the Congress for some time that would remove the need for Congressional authorization for border bridges and that this Order was issued in expectation of its passage. Further, this would bring the procedure for approving international bridges into conformity with the procedure for approving domestic ones. This gloss is brightened by yet another look at the legislative history of the bill, for that history also reveals that the Act itself was drafted not by Congress but within the Executive Department:

On September 15, 1971 the executive branch submitted a new draft on which [the Act] is largely based . . . 1972 U.S.Code Cong. & Admin.News, *supra*.

The most logical explanation for the symbiotic reading of the two documents is this: history, and the words of the documents themselves, shows that, after four years of

---

**3.** § 301. General authorization to delegate functions; publication of delegations

The President of the United States is authorized to designate and empower the head of any department or agency in the executive branch, or any official thereof who is required to be appointed by and with the advice and consent of the Senate, to perform without approval, ratification, or other action by the President (1) any function which is vested in the President by law, or (2) any function which such officer is required or authorized by law to *perform only with or subject to the approval*, ratification, or other action of the President: *Provided*, That nothing contained herein shall relieve the President of his responsibility in office for the acts of any such head or other official designated by him to perform such functions . . .

work in drafting a bill, the President issued an Executive Order anticipating its final passage; passage was not forthcoming for another three years; but the bill that was ultimately produced was the product of the same arm of the government that issued the Order, and was passed by a Congress that was well aware of both the provisions in that Order and the reason for its existence. The two documents are thus compatible with, and companions to, one another. And it must be emphasized that the Order simply provides Presidential approval in certain cases where the Secretary of State has gathered the necessary information and has concluded—*without disagreement* from the various departments within the executive branch—that approval is warranted. In this respect, the Secretary is also fulfilling an express function assigned him by the 1972 Act.

The court finds, then, that, if the prerequisites detailed in Executive Order 11423 are satisfied, the permit has presidential approval as contemplated by § 535b, provided that there has also been approval by the required International Boundary Commission.

### B.

[8] The requirements of Executive Order 11423 relevant to this suit provide:

(b) With respect to applications received . . . [for bridge permits] the Secretary of State shall request the views of the Secretary of the Treasury, the Secretary of Defense, the Attorney General and the Secretary of Transportation.[4]

. . . . .

(d) If the Secretary of State finds, after consideration of the views obtained pursuant to [subsection (b)], that issuance of a permit to the applicant would serve the national interest, he shall prepare a permit . . . and shall notify the officials required to be consulted under sub-

section (b) above of his proposed determination that the permit be issued.

. . . . .

(f) The Secretary of State shall issue . . . the permit . . . unless, within fifteen days after notification pursuant to [subsection (d)], an official required to be consulted under subsection (b) above shall notify the [Secretary] that he disagrees with the Secretary's proposed determination and requests the Secretary to refer the application to the President. In the event of such a request, the Secretary of State shall refer the application, together with statements of the views of the several officials involved, to the President for his consideration and final decision.

The Company maintains that, if the provisions of Executive Order 11423 do in fact apply to the County's permit, then the Secretary did not comply with them: by ignoring a "polite" request by the Coast Guard that the application be passed on to the President, he violated the requirements of § 1(f).

With regard to this claim, the Plaintiff's position is tenuous at best. Attached to the original complaint as "Exhibit A" is a letter from Captain J. B. Kirkland, Chief of the Bridge Division, United States Coast Guard, to Mr. John Crook of the State Department. The relevant portion of the letter states:

At this juncture the Coast Guard does not wish to assent or dissent in the proposed issuance of the State Department permit. Nevertheless, we note that considerable controversy exists. The existing bridge owner objects strongly to the use of the International Bridge Act to supplement his bridge authorized by a previous Act of Congress.

Therefore in view of the controversy, the likelihood of litigation and more importantly the precedence which will assuredly be established, consideration should be given to referring the application to the

---

4. The Secretary of Transportation by 49 CFR 1.45(b) and 1.46(c)(5), (6), (8), (9), and (10) delegated to the Commandant of the United States Coast Guard, with the authority to re-

delegate within the Coast Guard, the authority to exercise the functions, powers, and duties of the Secretary with respect to the Bridge Acts. *See* 33 CFR § 114.01.

President pursuant to Section 1(f) of E.O. 11423.

Attached also, and labeled "Exhibit B," is a letter to Mr. Crook from John A. Hurley (signed for Mr. Hurley by Robert A. Webster) that gives the position of the Treasury Department (via the Customs Service) regarding the proposed permit:

The U.S. Customs Service still maintains its original position that we do not oppose the construction of the proposed new international bridge at Presidio providing:

1. It does not result in the operation of two bridges at Presidio which would require additional Customs staffing for processing vehicles and persons entering the United States at this border crossing.

2. The plans for the new international bridge must include a new border inspection station at the United States terminal of the bridge.

These letters, according to the Company, show that the matter should have been passed on to the President.

Standing alone, these letters fashion little support, if any, for the Company's position. Nevertheless, because this is a motion for summary judgment, the court would not be disposed to dismiss the action unless the material facts were beyond dispute. A look at all the evidence in the suit reveals, however, that that is indeed the status of the matter; it is clear that the Secretary fully complied with the provisions of both Executive Order 11423 and the International Bridge Act.

█ In support of its motion for summary judgment, the Government has furnished the sworn affidavit of John A. Hurley—the same John A. Hurley who appears in Exhibit "B." Mr. Hurley states that the letter labeled Exhibit "B," which was sent over his name and expressed the views of his office—views that Mr. Webster expressed in a capacity acting for Mr. Hurley, who was the official vested with official responsibility for formulating those views—"was not intended to, nor did it, constitute a request that the Presidio application be referred to the President for decision." The

affidavit is more than sufficient to support the motion: the affiant speaks with personal knowledge; it sets forth *facts* that would be admissible; and Mr. Hurley is competent to testify about those facts.

It is clear that the requirement [in Rule 56(e)] of an affirmative showing applies to the competency of the affiant and not to the admissibility of the evidence . . . it is sufficient if the statements contained in the affidavit are in fact admissible; the affidavit need not contain any affirmative showing of admissibility. *United States v. Hanger One, Inc.*, 563 F.2d 1155, 1157 (5th Cir. 1977).

The Government has also furnished the sworn affidavit of Admiral Anthony F. Fugaro, who is—and was at the time of Captain Kirkland's letter—the Chief of the Office of Marine Environment and Systems of the United States Coast Guard. Admiral Fugaro testifies that in his capacity as Chief of that office he is "familiar with the views of the United States Coast Guard with respect to [the permit application]" and that those views are as follows:

Captain KIRKLAND'S letter was not intended to, nor did it, constitute a statement of Coast Guard disagreement with the determination made by the Department of State in connection with the Presidio application for purposes of Section 1(f) of E.O. 11423. Further, although that letter suggested that consideration be given to referring the Presidio application to the President, this was not a request under the terms of Section 1(f) of E.O. 11423.

Accordingly, although the Coast Guard believed that there was merit in referring the Presidio application to the President, we do not believe that the Department of State was required to do so by the terms of Captain Kirland's [sic] letter and of Section 1(f) of E.O. 11423.

This affidavit, too, is admissible: the affiant speaks with personal knowledge; it sets forth *facts* that would be admissible; and they are facts about which Admiral Furago is competent to testify. These affidavits remove all questions as to compliance with the Order.

■ Finally, the Government's position is cemented by eight exhibits that were submitted with the original motion to dismiss. These exhibits are all State Department records submitted under seal; as such, they are admissible under Rules 901(a), (b)(7), 902, Federal Rules of Evidence. They are also admissible under 28 U.S.C. § 1732, the Business Records Act. *See United States v. Certain Parcels of Land in Monroe County*, 509 F.2d 801 (5th Cir. 1975).[5] They conclusively show that the Secretary complied with all necessary requirements of the Bridge Act as well as those of the Executive Order.[6]

The Plaintiff has offered nothing in response to these affidavits; rather, it has chosen to rely solely on its pleadings and the motion to strike. The facts before the court are therefore uncontroverted. Having carefully considered those facts, as well as all the exhibits and affidavits in which they appear, the court finds that there are no material facts in issue and that the Defendant is entitled to judgment as a matter of law. Therefore, this suit is dismissed, and the clerk is directed to enter judgment accordingly.

---

**5.** The Company's opposition to these exhibits, filed prior to the motion for summary judgment and not subsequently bolstered by an affidavit, is misplaced. Rule 56(c) provides, in part, that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Thus, the only question regarding these documents, offered as exhibits, is whether they are admissible in evidence: if they are, it is within the province of the court to consider them. *See Munoz v. International Alliance of Theatrical Stage Employers and Moving Picture Machine Operators of United States and Canada*, 563 F.2d 205 (5th Cir.

1977); *Smoot v. State Farm Mutual Automobile Insurance Co.*, 299 F.2d 525 (5th Cir. 1962); *Danaher v. Michaw*, 435 F.Supp. 717 (N.D.Ind. 1977); *Upper West Fork River Watershed v. Corps of Engineers, United States Army*, 414 F.Supp. 908 (N.D.W.Va.1976), *aff'd*, 556 F.2d 576 (4th Cir. 1977), *cert. denied*, 431 U.S. 1010, 98 S.Ct. 720, 54 L.Ed.2d 752 (1978).

**6.** Exhibit "C" is a record of the hearing held on the County's application. Standing alone, it is conclusive evidence that the decision was in no way arbitrary or capricious. The Plaintiff's contentions on this point are specious. So too is its claim that this was an unjust taking within the Fifth Amendment.