**HURD URBAN DEVELOPMENT, L.C., et al., Plaintiffs,**

v.

**FEDERAL HIGHWAY ADMINISTRATION et al., Defendants.**

No. Civ.A. L–98–57.

United States District Court,
S.D. Texas,
Laredo Division.

Dec. 21, 1998.

Martin G. Wiele, Hughes & Luce, Austin, TX, David C. Duggins, Clark Thomas and Winters, Austin, TX, for Hurd Urban Development, L.C., Speedy Stop Food Stores, Ltd. and Retail Property Partners, Ltd.

Hector Carlos Ramirez, Office of U.S. Attorney, Laredo, TX, Ernest C. Garcia, Assistant U.S. Attorney, Austin, TX, for Federal highway Admin., Kenneth R. Wykle, Edward Wueste and C.D. Regan.

Ronda Leigh Neff, Office of Attorney General, Transportation Division, Austin, TX, for Texas Department of Transportation, City of Laredo, Tex. and Charles W. Heald.

Manuel O. Mendez, Bickerstaff Heath et al, Austin, TX, Bonnie Cox Lockhart, Bickerstaff Heath et al., Austin, TX, Jaime L. Flores, City Attorney, Laredo, TX, Douglas G. Caroom, Bickerstaff Heath et al., Austin, TX, for City of Laredo TX and Betty Flores.

## MEMORANDUM AND ORDER

KAZEN, Chief Judge.

Pending are Defendants' Motions to Dismiss,[1] as well as Plaintiffs' Motion for Summary Judgment (Dkt. No. 48) and City of Laredo Defendants' Cross–Motion for Sum-

1. Municipal, state, and federal defendants each filed separate Rule 12(b) motions attacking Plaintiffs' Complaint, as follows: Texas Dep't of Transp. and Charles W. Heald's 12(b)(6) Motion to Dismiss (Dkt. No. 7); City of Laredo and Betty Flores' 12(b)(1) and 12(b)(6) Motion to Dismiss (Dkt. No. 14); Federal Defendant's (Federal Highway Admin., Kenneth R. Wykle, and Edward Wueste's) 12(b)(6) Motion to Dismiss (Dkt. No. 27). As discussed below, the Court considers the issue of standing to be dispositive of Plaintiffs' first, second, and third causes of action. Because standing is a jurisdictional requisite, Defendants' pleadings will be construed by the Court as 12(b)(1) motions. *See Presidio Bridge Co. v. Secretary of State,* 486 F.Supp. 288, 294 (W.D.Tex.1978) (finding that the plaintiff lacks standing to sue under NEPA, the court concludes that "[t]his claim must, therefore, be dismissed for lack of jurisdiction over the subject matter"); *Bank One Texas v. United States,* 157 F.3d 397, 403 (5th Cir.1998) ("Since the granting of summary judgment is a disposition of the merits of the case, a motion for summary judgment is not the appropriate procedure for raising the defense of lack of subject matter jurisdiction." (citation omitted)).

mary Judgment (Dkt. No. 54). In addition to considering the briefs, the Court discussed the disputed issues with attorneys for all parties at a hearing on November 19, 1998.

## I. Background

### A. Facts of the Case

This dispute centers around the alignment of a road ("Bridge Road") that is to be constructed between Interstate 35 and the soon-to-be-built International Bridge IV in north Laredo, Texas. Originally, the Bridge Road was to be an expansion of the existing FM 3464, but Defendants have altered that alignment. The Bridge Road is now slated to run one thousand feet to the south of FM 3464. Plaintiffs are land owners on the north side of FM 3464. Under the old alignment, Plaintiffs' lands would abut the Bridge Road. As currently planned, Plaintiffs' lands lie one thousand feet north of the Bridge Road.

### B. Claims Brought and Relief Sought

Plaintiffs allege various economic and environmental harms, suing for violations of the National Environmental Policy Act ("NEPA"), the International Bridge Act ("IBA"), and 23 U.S.C. § 323(d). Plaintiffs claim standing to sue by virtue of the Administrative Procedures Act ("APA").

Plaintiff's Complaint specifically alleges four causes of action. First, that selection of the new Bridge Road alignment allegedly violates 23 U.S.C. § 323(d), a statute which Plaintiffs claim "prohibits donations of property from influencing the selection of right-of-way." Second, that the project's final environmental assessment allegedly failed to comply with NEPA. Third, that the Federal Highway Administration's issuance of the project's Finding of No Significant Impact ("FONSI") allegedly is "arbitrary and capricious, unreasonable, an abuse of discretion and in violation of law," because the FONSI issuance violates NEPA and 23 U.S.C. § 323(d). Fourth, that the change in the Bridge Road alignment allegedly violates the terms and conditions of the Presidential Permit.

Plaintiffs request declaratory judgment and injunctive relief. They seek a judicial declaration that the realignment of the Bridge Road violates NEPA, related federal regulations, and the Presidential Permit. Plaintiffs want this Court to effectively (1) void the donation of land to be utilized in the new Bridge Road alignment, and (2) rescind funding for the project. Plaintiffs also seek preliminary and permanent injunctions prohibiting Defendants (1) from using any alignment for the Bridge Road other than the originally planned FM 3464, and (2) from realigning the Bridge Road without performing an environmental impact statement.

During the hearing of November 19, 1998, Plaintiffs' counsel acknowledged that Plaintiffs' first three causes of action all hinge on their NEPA claim. Defendants' Motions to Dismiss allege, *inter alia*, that Plaintiffs lack standing to sue under NEPA.

## II. Standing to Sue Under NEPA

Because NEPA does not expressly contain a private right of action, a plaintiff must rely on the APA as the basis to sue. Therefore, in addition to satisfying the constitutional standing requirements, a plaintiff must meet the APA standing requirement that the plaintiff is "adversely affected or aggrieved ... within the meaning of a relevant statute" by some final agency action. *Lujan v. National Wildlife Federation* 497 U.S. 871, 883, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Committee to Save the Rio Hondo v. Lucero,* 102 F.3d 445, 447 (10th Cir. 1996). To be adversely affected within the meaning of NEPA, a plaintiff must establish an injury in fact falling within the "zone of interests" protected by NEPA. *United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 686, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton,* 405 U.S. 727, 733, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *see also National Wildlife Federation,* 497 U.S. at 883, 110 S.Ct. 3177; *Nevada Land Action Ass'n v. U.S. Forest Service,* 8 F.3d 713, 715–16 (9th Cir. 1993) ("Thus, in addition to constitutional standing requirements, under the APA a plaintiff must assert an interest 'arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" (quoting *Association of Data Processing Service Organiza-*

*tions, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970))).

■ Plaintiffs enumerate five ways in which Defendants' actions will adversely affect or aggrieve their interests. *Complaint,* Dkt. 1, ¶ 31. In the November hearing, Plaintiffs' counsel candidly stated that Plaintiffs' protected interests were reducible to purely economic concerns—they seek to avoid a loss of business from the reduced traffic flow that arguably would occur if FM 3464 becomes a side street rather than the new Bridge Road.

### a. Economic Harms

Plaintiffs maintain that economic concerns are within NEPA's zone of interest, citing *Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (to be published at 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281). The *Bennett* petitioners filed under the citizen-suit provision of the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g)(1), to protect parts of both the Klamath River and the Lost River, and to protect the shortnose sucker fish. *Bennett,* 117 S.Ct. at 1158–59. Petitioners claimed that their "use of the reservoirs and related waterways for 'recreational, aesthetic and commercial purposes, as well as for their primary sources of irrigation water' will be 'irreparably damaged' by the actions complained of." *Id.* at 1160 (quoting App. to Pet. for Cert., p. 34).

Plaintiffs' reliance on *Bennett* is apparently based upon the Supreme Court's interpretation of the requirement in 16 U.S.C. § 1536(a)(2) that each agency "use the best scientific and commercial data available" when making ESA jeopardy determinations. Plaintiffs contend that the Supreme Court's interpretation of this language now supports the conclusion that a NEPA suit may be based purely on a plaintiff's economic harm. This Court disagrees.

First, *Bennett* interprets the ESA, not NEPA, and the ESA contains a citizen-suit provision which has a much looser standing requirement than an APA-based NEPA action. Second, the language construed by *Bennett,* calling for use of "the best scientific and commercial data available" in making ESA jeopardy determinations (16 U.S.C. § 1536(a)(2)), is language not found in NEPA. Indeed, the Supreme Court construed § 1536(h) to mean that "economic consequences are an explicit concern" of the ESA. 117 S.Ct. at 1168. Plaintiffs point to no similar provision in NEPA.[2]

Third, NEPA cases prior to *Bennett* consistently have held that economic harms are not within NEPA's zone of interest. *See Metropolitan Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766, 772, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983) ("The purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions."); *Nevada Land Action Ass'n v. United States Forest Serv.,* 8 F.3d 713, 716 (9th Cir.1993) ("Therefore a plaintiff who asserts purely economic injuries does not have standing to challenge an agency action under NEPA."); *Churchill Truck Lines, Inc. v. United States,* 533 F.2d 411, 416 (8th Cir.1976) (stating that plaintiffs "whose sole motivation in this case was their own economic self-interest and welfare, are singularly inappropriate parties to be intrusted with the responsibility of asserting the public's environmental interest"); *Clinton Community Hosp. Corp. v. Southern Maryland Medical Center,* 510 F.2d 1037, 1038 (4th Cir.1975) ("If it has in fact suffered an injury, appellant's economic well-being vis-a-vis its competitors is certainly not 'arguably within the zone of interests to be protected' by the Federal environmental laws [including NEPA]." (quoting *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970))); *Presidio Bridge Co. v. Secre-*

**2.** There are two other important distinctions between this case and *Bennett*. First, the *Bennett* petitioners claimed environmental (sucker fish) injury in addition to economic injury. Second, the petitioners' prospective economic harm allegedly would be caused by a reduction in available water flow. Damage to water flow is itself an environmental harm, irrespective of whatever

economic harms may result, and falls within environmental standing requirements set forth by the Supreme Court in *Metropolitan Edison,* 460 U.S. 766, 770, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983) (stating that, for purposes of standing, it is sufficient that the complaint set forth threatened harms to the "physical" environment—"the air, land and water which support life on earth").

*tary of State,* 486 F.Supp. 288, 294 (W.D.Tex. 1978) ("The N.E.P.A. simply was not meant to be used as a device whereby plaintiffs with strictly economic interests would be allowed to thwart governmental activity under the guise of environmental interest." (quoting *Hiatt Grain & Feed, Inc. v. Bergland,* 446 F.Supp. 457, 487 (D.Kan.1978))). The Court does not read *Bennett* as overturning this established NEPA jurisprudence *sub silentio,* and therefore concludes that all NEPA claims based on economic harm must be dismissed for lack of jurisdiction over the subject matter. *See Presidio,* 486 F.Supp. at 294.

### b. Environmental Harms

Although Plaintiffs admit they are essentially complaining of economic injury, their Complaint does allege specific environmental injuries, and Plaintiffs' *Reply in Opposition to Cross Motion for Summary Judgment* reiterates Plaintiffs' "interests in their own immediate urban environment." Dkt. No. 57, p. 3.

■ The environmental concerns that Plaintiffs express, however, do not satisfy the "injury in fact" requirement necessary for standing. Standing requires that three elements be satisfied. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) "concrete and particularized" and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* (citations omitted). Second, a causal connection must exist between the injury and the conduct complained of, *i.e.,* the injury must be fairly traceable to the challenged action. *Id.* Third, it must be likely that the injury will be redressed by a favorable court decision. *Id.* at 561, 112 S.Ct. 2130. Because Plaintiffs cannot meet the first standing requirement—injury in fact—the Court need not reach the issues of causation and redressability.

■ In order for a plaintiff to have standing under the APA to complain of a NEPA violation, the plaintiff must be among those injured by the challenged action. *Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) ("But the 'injury in fact' test [as applied to APA] requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured.") To fully establish injury in fact, a plaintiff must show the risk that injury to the plaintiff's *concrete and particularized* interests will flow from the agency's delinquency. *Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130; *see id.* at 573 n. 8, 112 S.Ct. 2130 (holding that an individual can enforce procedural rights, "so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing"). In *Defenders of Wildlife,* the Supreme Court stated:

> We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.

*Id.* at 573–74, 112 S.Ct. 2130. Therefore, "injury in fact" requires that a plaintiff show "an invasion of a legally protected interest which is *'concrete and particularized.'*" *Committee to Save the Rio Hondo v. Lucero,* 102 F.3d 445, 447 (10th Cir.1996) (quoting *Defenders of the Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130 (emphasis added)).

■ To meet this test, a plaintiff must establish either a "geographical nexus" to, or actual use of, the site impacted by the agency action, such that the plaintiff may be expected to suffer the environmental consequences of the action. *See Rio Hondo,* 102 F.3d at 449 (holding that Article III standing requires a NEPA litigant to "show that the increased risk of environmental harm injures its concrete interests by demonstrating either its geographical nexus to, or actual use of the site of the agency action"); *Douglas County v. Babbitt,* 48 F.3d 1495, 1501 (9th Cir.1995) (stating that the "geographic nexus" test is equated with the "concrete interest" test of *Defenders of Wildlife,* 504 U.S. at 573 n. 8, 112 S.Ct. 2130).

In their Complaint, Plaintiffs allege three potential environmental injuries they would suffer due to Defendants' actions:

(1) "The realignment of the Bridge Road will cause significant division or disruption of an established community or disrupts orderly, planned development, or is significantly inconsistent with plans or goals that have been adopted by the community in which this project is located;"

(2) "The realignment of the Bridge Road will adversely affect the urban environment as it will cause additional and unnecessary roadways;"

(3) "The realignment of the Bridge Road will cause an adverse decline in the rural environment and unnecessarily over-appropriates farmland for the project."

*Complaint*, Dkt. No. 1, p. 11. Plaintiffs' *Reply in Opposition to Cross Motion for Summary Judgment* reiterates their "interests in their own immediate urban environment." Dkt. No. 57, p. 3. Plaintiffs claim that "[i]t cannot be denied that the transformation of FM 3464 from a major thoroughfare to a by-passed city street will drastically alter the urban environment at plaintiffs' property." *Id.*

■ Plaintiffs' alleged environmental injuries do not satisfy NEPA's "injury in fact" standing requirement, because Plaintiffs fail to allege specific facts of concrete, individualized harm. *See Sierra Club v. Morton*, 405 U.S. 727, 739-40, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (stating that a plaintiff must "allege facts showing that he is himself adversely affected"). Plaintiffs fail to show either a concrete interest in, or a "geographic nexus" with, the property allegedly impacted environmentally. *See Douglas County v. Babbitt*, 48 F.3d 1495, 1501 (9th Cir.1995) (stating that the "geographic nexus" test is equated with the "concrete interest" test of

*Defenders of Wildlife*, 504 U.S. at 573 n. 8, 112 S.Ct. 2130).

Plaintiffs argue that, because they "own land along the north side of existing FM 3464 and are members of the Laredo community, they have established a 'geographic nexus' to, or actual use of, the site where the agency action will be felt." Dkt. No. 17, p. 10. This assertion misapprehends the "geographic nexus" requirement. As an initial matter, all residents of Laredo are "members of the Laredo community," yet not all Laredoans have standing to sue.

Moreover, as to their owning land along the north side of FM 3464, Plaintiffs' "interest in their own immediate urban environment" amounts to a desire for the Bridge Road to be closer to, not farther away from, their own property.[3] It is common knowledge in this community that a road intended to direct commercial trucks into Mexico will create a virtual armada of vehicles. The Bridge Road realignment would place this traffic farther away from, not closer to, Plaintiffs' property. Therefore, to the extent that Plaintiffs might claim any direct environmental harm, other than economic loss, it would seem that the farther away this traffic moves from Plaintiffs' property, the better off they would be. It is clear from reading this file and from the parties' representations at the November hearing that Plaintiffs' desire to be closer to the Bridge Road—thereby certainly exposing them to more noise, exhaust, sight, and other pollution—directly stems from their economic interests. Plaintiffs do not complain that the alignment of Bridge Road traffic will environmentally degrade their property; instead, they seek exposure to arguably greater environmental harm for their own economic benefit. As indicated above, this type of claim is not within NEPA's zone of interest, and not protected by the APA.

3. Plaintiffs' statements in their Complaint make this clear. Plaintiff Hurd Urban Development has developed their property into an industrial park, and Plaintiffs state that "[t]he success of Hurd's industrial park along the north side of FM 3464 depends on visibility and in some part on drive-by business." *Complaint*, Dkt. No. 1, ¶ 7. Plaintiff Speedy Stop Food Stores, Ltd., "Speedy Stop," owns the fixtures and equipment, and operates, a convenience store along the north side of FM 3464. Plaintiff Retail Property Partners, Ltd., owns the land at the convenience store and leases the land to Speedy Stop. Plaintiffs state that "the success of Speedy Stop's and Retail Property Partner's going concern on the corner of FM 3464 and FM 1472 depends in large part on drive-by business." *Complaint*, Dkt. No. 1, ¶ 8.

Plaintiffs' reliance on *Gerosa, Inc. v. Dole,* 576 F.Supp. 344 (S.D.N.Y.1983), is misplaced. The *Gerosa* plaintiff claimed that construction of a railroad bridge along the east bank of the Harlem River would permanently block all navigational access to the plaintiff's five-hundred foot heavy duty dock. 576 F.Supp. at 346. That court pointedly observed that any claim of economic harm must be "inextricably linked to a not insignificant harm to the physical environment," which in *Gerosa* was the elimination of a substantial portion of accessible and navigable shoreline on the Harlem River. *Id.* at 349. "For purposes of standing, it is sufficient that the complaint set forth threatened harms to the 'physical' environment—'the air, land and water which support life on earth.'" *Id.* at 349 n. 2 (quoting *Metropolitan Edison,* 460 U.S. 766, 770, 103 S.Ct. 1556, 75 L.Ed.2d 534).

The instant case is manifestly different. It does not concern any concrete and particularized harm to a scarce natural resource. The only concrete, individualized harm Plaintiffs seek to protect against is reduced business due to geographic remoteness from an accessible and driveable roadway. Protection of a shoreline is within NEPA's zone of interest; ensuring that a greater number of vehicles traverse one's land is not.

Plaintiffs have not established a geographic nexus to, or actual use of, the impacted area, and thus have not alleged an "injury in fact" concerning their environmental interests. Therefore, they have not alleged any interest for which they have standing to sue under NEPA.

### III. Plaintiffs' 23 U.S.C. § 323 Claim

■ Plaintiffs claim that § 323(d) "prohibits donations of property from influencing the selection of right-of-way." *Complaint,* Dkt. No. 1, ¶ 69. It does not. In fact, what the statute prohibits is influencing the environmental assessment of a project, including the selection of a specific location. In other words, the statute seeks to prevent a donation's improper influence over an environ-mental assessment. It does not mean that cost may not be considered when directly deciding road placement. Property donations necessarily reduce costs, and property donation is both contemplated and facilitated by the statute.

Plaintiffs' *Reply in Opposition to Cross Motion for Summary Judgment* expands upon their theory of § 323. Dkt. No. 57, p. 4–6. Plaintiffs state that the "donation not only influenced the environmental assessment of the project, including the decision on the need to build a new road and the specific location of that new road, *it was the only reason the inquiry was even undertaken."* *Id.* at 5 (emphasis added). This assertion conflates two distinct concepts. There is an obvious difference between improperly influencing the outcome of an environmental assessment and dictating that an environmental assessment must be made. The fact that proposed use of donated land may require an environmental assessment does not mean that all donated land is environmentally unsuitable. Therefore, the donation of land itself does not violate § 323(b), even if Plaintiffs did have standing to bring the claim.

### IV. Plaintiffs' International Bridge Act/Presidential Permit Claim

Plaintiffs' IBA claim rests upon their assertion that Defendants did not receive required approval from the State Department prior to the Bridge Road realignment. In a cross-motion for summary judgment, Defendant City of Laredo asserts that the State Department has, through its silence, manifested its acquiescence to the change.[4] At the November hearing, Defendants represented that official approval now has been requested from the Secretary of State. The Court therefore defers ruling on Defendants' motions to dismiss with regards to Plaintiffs' fourth cause of action, to allow reasonable time for the State Department to respond.

Defendants are **DIRECTED** to inform the Court of the Secretary of State's official reply as soon as it is received.

---

4. The City asserts that "[b]ecause the Secretary of State has not indicated that this change in the connector route is a 'substantial change' that will violate the Presidential Bridge Permit or require any sort of State Department approval, Defendant have not violated Article 15 [of the Permit]." Dkt. No. 54, p. 11.

### V. Conclusion

For the reasons set forth above, Plaintiffs lack standing to bring their first three causes of action. Therefore, Defendants' motions to dismiss (Dkt. Nos. 7, 14, and 27) are **GRANTED** with respect to Plaintiffs' causes of action one, two, and three. Plaintiffs' motion for summary judgment (Dkt. No. 48) and Defendants' cross-motion for summary judgment are **DENIED AS MOOT** with respect to Plaintiffs' first cause of action.

The Court defers ruling on all pending motions with respect to Plaintiffs' IBA cause of action until such time as the Department of State responds to Defendants' request for realignment approval. Defendants are **DIRECTED** to inform the Court as soon as the Department of State responds.