**GLOBE, INC., T/A Globe Book Shops et al., Plaintiffs,**

v.

**FEDERAL HOME LOAN BANK BOARD et al., Defendants.**

**Civ. A. No. 78–1632.**

United States District Court, District of Columbia.

Feb. 9, 1979.

Judgment Entered March 21, 1979.

William E. Nelson, Washington, D. C., for plaintiffs.

Charles R. Donnenfeld, Philip D. Green, Schwalb, Donnenfeld & Bray, Washington, D. C., for Crown Books.

Harold B. Shore, Associate Gen. Counsel, Matthew G. Ash, Patricia M. Eanet, Trial Attys., Federal Home Loan Bank Bd., Washington, D. C., for defendants the Federal Home Loan Bank Bd. and Robert H. McKinney.

MEMORANDUM

OBERDORFER, District Judge:

This case is before the Court on cross-motions for summary judgment. For the reasons set out in this Memorandum, the Court grants in part and denies in part plaintiffs' motion for summary judgment and denies defendants' motion for summary judgment.

## I. *Findings of Fact*

1. Globe, Inc. (Globe) is a corporation engaged in the business of selling books at retail in the Metropolitan Washington area. It operates stores at, among other places, 1700 Pennsylvania Avenue, N.W., and 888 17th Street, N.W. in the District of Columbia.

2. Crown Book Corporation (Crown) is a wholly-owned subsidiary of Dart Drug, Inc., and is also engaged in the business of selling books, magazines, and related items at retail in this area.

3. The Federal Home Loan Bank Board (FHLBB) is an independent agency in the Executive Branch of the United States Government, with quarters at 1700 G Street, N.W. FHLBB was created by and operates under the authority of the Federal Home Loan Bank Act of 1932, as amended directly by statute and indirectly, from time to time, by riders in appropriations, *e. g.*, Public Law 93–414, 88 Stat. 1095, 1107, September 6, 1974.

4. Congress created FHLBB in 1932

"both as a present emergency relief of and as a permanent aid to . . . home-building, home-improving, and home-financing organizations of our country."

Statement of Representative John H. Overton, 75 Cong.Rec. 12603, 72d Cong., 1st Sess. (1932). *See also, Association of Data Processing, Etc. v. Federal Home Loan Bank Board of Cincinnati,* 421 F.Supp. 384, 389–390 (S.D.Ohio, 1976).

5. General Services Administration is an agency in the Executive Branch of the United States Government headed by an Administrator. 40 U.S.C. § 751(a) and (b). Congress has provided generally that:

"No public building shall be constructed except by the Administrator, who shall construct such public building in accordance with this chapter." 40 U.S.C. § 601.

6. The Administrator's authority to construct or acquire buildings is subject to prior approval by the Committee on Public Works of the Senate and House of Representatives. 40 U.S.C. § 606(a). As a requisite to such approval, the Administrator is required to:

"transmit to Congress a prospectus of the proposed project . . . "

7. With respect to construction or alteration of buildings in the District of Columbia, Congress has directed the Administrator to proceed

"as nearly as may be practicable in harmony with the plan of Peter Charles L'Enfant and such buildings shall be so constructed as to combine architectural beauty with practical utility."

40 U.S.C. § 607(a).

8. Congress has authorized the Administrator to delegate to executive agencies, as that term is defined,

"The performance, in accordance with standards established by the Administrator . . . of the responsibilities and authorities vested in him . . . where the Administrator determines that such delegation will promote efficiency and economy."

40 U.S.C. § 614.

9. FHLBB has not offered any evidence that the Administrator has delegated any of his powers to FHLBB pursuant to 40 U.S.C. § 614.

10. In 1976, Congress amended the laws governing the Administrator's responsibility for public buildings to require him to encourage the location of commercial, cultural, educational and recreational facilities and activities within public buildings. Public Buildings Cooperative Use Act of 1976 (Public Law 94–541). Section 104 of the 1976 Act specifically authorized him to lease certain space in public buildings to tenants who would use it for those purposes. The

1976 law limited this authorization to the Administrator. It did not refer to FHLBB or authorize it to lease out its space commercially. Nor did it authorize "concession agreements."

11. The Federal Home Loan Bank Act of 1932 did not authorize the FHLBB to own or lease real property for its quarters. Nor did it authorize FHLBB to grant or otherwise operate "concessions."

12. In 1966, Congress enacted a new subsection to the 1932 Act relating to quarters and facilities for FHLBB itself. Pub.L. 89–754, § 1016(b)(2), 80 Stat. 1293, 12 U.S.C. § 1438(c). That legislation provided that

"The board, *utilizing the services of* the Administrator of *General Services* (hereinafter referred to as the "Administrator"), and *subject to* any *limitation* hereon which may hereafter be *imposed in appropriation Acts*, is hereby authorized—

(A) *to acquire, in the name of the United States, real property* in the District of Columbia, for the purposes set forth in this subsection;

(B) to construct, develop, furnish, and equip such buildings thereon and such facilities as in its judgment may be appropriate to provide, to such extent as the board may deem advisable, suitable and adequate quarters and facilities for the board and the agencies under its administration or supervision;

(C) to enlarge, remodel or reconstruct any of the same; and

(D) to make or enter into contracts for any of the foregoing." (emphasis added) 12 U.S.C. § 1438(c)(1).

Paragraph (2) of the 1966 subsection authorized FHLBB to require of its constituent banks "advances of funds for the purposes set out in paragraph (1)." 12 U.S.C. § 1438(c)(2).

Paragraph (3) made the plans and design of any building to be constructed pursuant to paragraph (1) subject to the approval of the Chairman of FHLBB to such extent as he might request. 12 U.S.C. § 1438(c)(3).

13. In the context of the foregoing, paragraph (4) of the 1966 subsection provided that:

"*Upon the making of arrangements mutually agreeable to the board and the Administrator,* which arrangements may be modified from time to time by mutual agreement between them . . . , the *custody, management, and control* of such buildings and facilities and of such real property *shall be vested in the Administrator in accordance therewith. Until the making of such arrangements such custody, management, and control,* including the assignment and allotment . . . of building and other space, *shall be vested in the board.*" (emphasis added) 12 U.S.C. § 1438(c)(4).

14. The 1966 Act makes no explicit provision for third parties to lease any of the properties acquired by FHLBB for its quarters. Nor does the 1966 Act provide for the granting of "concessions" to anyone.

15. Public Law 93–414, appropriating funds for fiscal year 1975, amended 12 U.S.C. § 1438(c) to authorize FHLBB to require additional assessments from its constituent banks for purposes "which shall include related commercial facilities." This rider made no reference to the division of responsibility for FHLBB quarters as between FHLBB and GSA.

16. In 1976, GSA and FHLBB entered into a "Memorandum of Agreement on New Federal Home Loan Bank Building." The stated purpose of the Memorandum of Agreement was to set forth the respective obligations of GSA and FHLBB concerning construction of the building. The Memorandum of Agreement recited that, pursuant to the authority of 12 U.S.C. § 1438(c),

"[T]he services of GSA have been utilized to acquire real estate for construction thereon of the building . . . . . The services of GSA shall continue to be utilized to manage the FHLBB building project in accordance with this Memorandum of Agreement.

\* \* \* \* \* \*

The first floor (street level) will consist of commercial shops with Government office space and rental office space on upper floors.

\* \* \* \* \* \*

. . . Except as may be requested by [FHLBB], the GSA shall manage the project in accordance with the policies, procedures, data, standards, specifications, criteria and financial accounting of the G.S.A."

17. On September 9, 1977, Jay Solomon, Administrator of GSA, wrote to Robert H. McKinney, Chairman of FHLBB, about matters of mutual concern, including, "the operation and management of the building (the latter being a function which will need to be initiated within the near future)." With respect to the matter of

"[A]rrangements for GSA's assumption of the function of managing the building for the Board,"

Administrator Solomon wrote that he had earlier indicated that

"the General Counsel of GSA has advised me that, in enacting 12 U.S.C. 1438(c)(4), Congress contemplated that, once the building was constructed, GSA was to assume the custody, management, and control of the building, on the Board's behalf, leaving the details of the arrangement to be worked out between the two organizations. There have been intimations by officials of the Board that mutually acceptable terms could not be arrived at, and that the Board would therefore manage the building itself.

We are prepared to initiate immediately the discussion of terms of a management and operation agreement. In conformity with 12 U.S.C. 1438(c)(4), and to expedite all the preliminaries, the execution of the agreement, and the commencement of services that are mutually satisfactory.

Please let me hear from you as soon as possible, and if I can be of further help, feel free to call on me."

18. On October 13, 1977, FHLBB member Garth Marston, designated by the Chairman for the task, wrote to James B. Shea, Public Building Commissioner at GSA, among other things, the following:

"3. _Building Operation_ [as summarized by a portion of Chairman McKinney's letter of September 19]: '[T]he Board . . . determined that however desirable it might appear to have GSA expertise manage our new building, that this could only be done under negotiated terms, biddable and annually renewable, and the terms of which would protect the Board.' (We look forward to participating with you and your staff in utilizing GSA services to the maximum extent. I was impressed with Mr. Packard's approach that we are potential customers and that GSA is anxious to act as our agent.)"

19. On November 10, 1977, Marston wrote Shea, acknowledging a preliminary look at a "Memorandum of Understanding," and noting areas "which need discussion," particularly FHLBB's desire for "an annually renewable agreement." The November 10 letter anticipated future discussion of "a Memorandum of Understanding" consistent with the intent of 12 U.S.C. § 1438 and "our expressed desire to have an agreement which is both financially and operationally acceptable to [FHLBB] and GSA."

20. On November 18, 1977, Administrator Solomon wrote Chairman McKinney, terminating negotiations of any operation agreement as follows:

" . . . I have arrived at the conclusion that not only would it not be in the best interest of GSA to assume operation of the building at this point, but it would be unfair to my people to do so.

I regret that we have not been able to reach an agreement but feel that there is no useful purpose in pursuing the matter further."

Administrator Solomon preceded this announcement of his decision by referring to the "shared responsibility" of FHLBB and GSA "to reach mutual agreement for GSA to take over the operation of the building." He related GSA's "willingness in this regard to not only satisfy the obvious intent

which Congress expressed in U.S.C. 12 Section 1438, but to fulfill our basic mission to operate buildings of the federal government." Administrator Solomon noted, however, prior discussions between FHLBB and GSA about "certain areas which we considered extremely important that should not be interfered with for the successful operation of the building", and various commitments which had been made to interested agencies "in order to obtain the necessary approval for the project and to counter the considerable criticism the project generated." Finally, he noted that during the three months which passed without completion of an agreement, "actions have taken place which violate the integrity of the building . . . ." (A copy of Administrator Solomon's November 18, 1977 letter is annexed as Appendix 1.)

21. On December 2, 1977, Chairman McKinney responded to Administrator Solomon's November 18 letter. After stating that he was "surprised by its conclusion", he related additional facts about the unsuccessful negotiations and assured Administrator Solomon of an "intention to maintain the integrity of this building in accordance with applicable law and regulations." Chairman McKinney accepted, without further discussion, Administrator Solomon's "decision to withdraw from the operation of the building . . . ." Chairman McKinney's December 2, 1977 response to Administrator Solomon is annexed as Appendix 2.

22. Neither Chairman McKinney nor Administrator Solomon, nor anyone acting for them, made any further effort to agree upon "arrangements" with respect to the custody, control, and management of FHLBB quarters. No effort was made to petition Congress to amend § 1438(c)(4) to relieve GSA and FHLBB from their responsibility to agree upon some arrangement.

23. On May 16, 1978, FHLBB and Crown entered into a ten-year agreement captioned: "Federal Home Loan Bank Board Concession Agreement."

(a) The agreement consists of 32 pages, plus several supporting exhibits. It was signed by FHLBB and Crown and was amended by them on September 1, 1978. Crown's performance and payment are guaranteed by Dart Drug Corporation. GSA is not a signatory to the agreement or the amendment and is not mentioned in either the agreement or the amendment.

(b) Section 2.01 of the agreement, as amended, "permits the Concessionaire to use the premises", consisting of approximately 3,717 square feet on the first floor in the FHLBB quarters at 1700 G Street, N.W., and recites "the intention of the parties that this Agreement grant Concessionaire a license, and no other real property, leasehold, or possessory rights or interests in the premises."

(c) The term of the agreement is 10 years; it is renewable at the option of the Concessionaire for two additional five-year periods.

(d) The agreement, as amended, provides that in consideration for the concession, Crown is obligated to pay a "minimum concession fee" ranging from $2,400.00 per month for the first five-year period up to $3,600.00 per month in the final ten years. In addition, Crown agreed to pay "as a percentage fee four per cent of its gross receipts in excess of $1,000,000 per year or uncompleted fraction of a year."

24. On October 13, 1978, the Comptroller General of the United States published a report entitled "Government Space Leased to Commercial Activities by Agencies Other Than the General Services Administration," prepared at the request of the Subcommittee on Government Activities and Transportation of the House Committee on Government Operations. The face of the report states:

"Although there is no specific authority for agencies other than the General Services Administration to lease Federal space to commercial enterprises, the Federal Home Loan Bank Board and the National Bureau of Standards are doing so.

The issue also arises whether the Bank Board had authority to construct a building with space for use by other than the Federal Government and for support-related activities.

If the Congress considers it appropriate for agencies other than the General Services to lease space to commercial entities, it should specifically authorize such activities and include procedural safeguards. This report was requested by the Subcommittee on Government Activities and Transportation, House Committee on Government Operations."

The report, addressed to Congressman John L. Burton, Chairman of the Subcommittee, stated that, among other things, at the Chairman's request the Comptroller had reviewed "the leasing activities of the new Federal Home Loan Bank Board building in Washington, D. C." The Comptroller found that

" . . . the Bank Board cited the legislation giving them authority to control and manage the space they occupy as their authorization to lease space to commercial activities. Currently, no legislation expressly authorizes [FHLBB] to lease the space they control and manage.

. . . The Board has no express statutory authorization to construct a building with space for non-Federal profitmaking commercial enterprises."

The Comptroller concluded that:

"Although the . . . Bank Board lease[s] out space [that it] control[s], there is a basis for questioning whether [the Bank Board is] authorized to lease space based solely upon its statutory authority to control and manage real property in view of a lack of express authority to do so."

The Comptroller, noting the pendency of this lawsuit, declined to answer that question because the answer was not clear-cut, and because of his policy not to "express an opinion on legal questions which are in litigation."

The Comptroller identified the following as a "Matter . . . for Consideration By the Congress":

"If the Congress considers it appropriate for agencies other than General Services to engage in commercial leasing in building projects under their control, other than for the normal employee-support functions (such as credit unions, cafeterias, and employee associations), the Congress should specifically authorize such activity and subject it to limitations the same or similar to those applicable to General Services under the Public Buildings Cooperative Use Act of 1976. These limitations concern leasing space under reasonably competitive circumstances at prevailing commercial rates and entering into leasing arrangements that will not be disruptive to the operation of the building."

25. GSA has not ratified or approved the Concession Agreement between Crown and FHLBB.

26. Neither Congress, nor any of its Committees, has ratified or approved the Concession Agreement.

27. FHLBB offered both Globe and Crown an opportunity to compete for the concession ultimately licensed to Crown. Either because of a misunderstanding or lack of interest, Globe did not pursue the opportunity as vigorously as Crown.

28. Crown took possession of the premises licensed to it by the Concession Agreement and commenced business there on or about November 20, 1978. Crown is now conducting a retail book business directly across the street from Globe. The resulting competition threatens to reduce Globe's sales and profits from its retail book business below what they would be if Crown and FHLBB had not entered into the Concession Agreement.

## II. *Conclusions of Law*

1. This Court has federal question jurisdiction. 28 U.S.C. § 1331.

2. Globe has the requisite standing to sue. The Concession Agreement has positioned a powerful competitor in the retail book business directly across the street from Globe and allegedly given it the business advantage of a favorable long-term lease. As a result, the Agreement directly threatens to injure plaintiff's business and to reduce its potential sales and potential profits. Globe's "personal stake in the out-

come" is a classic one. See *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Thus, Globe easily falls within the category of plaintiffs entitled to sue to protect a financial interest, *see also Association of Data Processing Service Organizations v. Camp,* 392 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and, incidentally, to serve the public interest in seeing to it that government agencies execute the laws as Congress writes and intends them.[1] *Compare U. S. v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974).

3. A fair reading of 12 U.S.C. § 1438(c)(4) requires the conclusion that Congress intended to vest in GSA (not FHLBB) long-term custody, management and control of the quarters acquired by FHLBB in the name of the United States. *See* Report of Comptroller General, October 13, 1978. The reference to "arrangements *mutually agreeable* to the board and the Administrator" (emphasis supplied) contained in the first clause of § 1438(c)(4) must be read in light of the last clause of the same sentence providing that "custody, management and control . . . *shall be vested in the Administrator* in accordance therewith." (emphasis supplied) Congress did not provide that custody, management and control of FHLBB quarters shall be vested in the Administrator or FHLBB in accordance with arrangements mutually agreeable to them. Congress wrote that the Administrator is to be vested with custody, management and control of the building. Whatever the mutually agreeable arrangements reached between the Administrator and FHLBB specify as to the details of the exercise of such control they may not, by the statute's terms, fundamentally alter or eliminate the Administrator's role as custodian and manager.

The provision vesting custody, management and control in FHLBB "until the

making of such arrangements" was plainly intended to confer that authority upon FHLBB only temporarily. If Congress had intended that FHLBB should enjoy permanent authority over its quarters, Congress could have used the familiar draftsman's device of vesting authority in FHLBB "*unless* and until the making of such arrangements."

Thus, § 1438(c)(4) envisioned that GSA and FHLBB would reach an understanding regarding the details of GSA's assumption of custody, management and control over FHLBB's quarters. If, in the interim, FHLBB should attempt to exercise its temporary management authority by entering into a lease (or similar) agreement, it is the unavoidable implication of the statutory language and its context that any lease or agreement made by FHLBB should either be temporary, consistent with FHLBB's temporary authority to exercise custody, management and control over its quarters, or be formally approved by GSA and fully consistent with the laws and policies governing GSA in parallel situations. When mutually agreeable arrangements between GSA and FHLBB proved to be impossible, FHLBB should have postponed any long-term commitments and petitioned Congress for authoritative instructions. In fact, by its own admission FHLBB began its outleasing program in August, 1977, almost contemporaneously with beginning discussions with GSA regarding control of the building and approximately three months before GSA broke off negotiations.

4. FHLBB contends that prospective tenants would not have accepted short-term tenancies because of the necessity of making heavy expenditures for capital improvements. Defendants' Opposition to Plaintiffs' Motion for Summary Judgment at 6. In that case, the proper solution would have been to attempt to reach agreement with GSA at least as to the outleasing program or to petition Congress for authoritative instructions. FHLBB has done neither.[2]

---

1. Plaintiff's standing is enhanced by the relatively passive stance of the United States Attorney, as amicus curiae, and of the General Services Administration.

2. The obstacles blocking agreement between GSA and FHLBB with respect to management of the building apparently concern certain actions by FHLBB which the Administrator alleg-

FHLBB's argument that 12 U.S.C. § 1438(c) imposes no absolute duty upon it to reach agreement with GSA regarding control of the building is misconceived. The point is not that FHLBB was under a legal duty to reach agreement with GSA (although it undoubtedly had a responsibility to try to reach such agreement), but rather that until such an agreement was reached, FHLBB's authority with respect to management of the building was correspondingly circumscribed, as indicated above.

5. Congress has concentrated management authority for public buildings in GSA. It is to GSA that Congress, in 1976, gave general authority to begin commercial outleasing in federal buildings under its control. See Public Buildings Cooperative Use Act of 1976, Pub.L. 94–541, § 104(b), 40 U.S.C. § 490(a)(16). Congress has presumed and decided that GSA has the experience and expertise necessary to carry out the commercial outleasing policy of Congress which includes, besides the simple generation of revenues, promotion of competition and protection of the public interest.[3] *Id.* On the other hand, FHLBB had a Spartan beginning in 1932 in the Great Depression during the Administration of President Herbert Hoover. It was created for the specific and narrow purpose of facilitating emergency (and later permanent) credit for individual home owners. It had no authori-

ty with respect to real property for its own quarters until Congress enacted 12 U.S.C. § 1438 in 1966. A fair reading of that statute gives FHLBB only temporary, and therefore, limited, authority with respect to such property. By contrast, Congress has vested ultimate management and control of FHLBB quarters in GSA, the federal agency traditionally and primarily entrusted with the management of federal buildings.

The conclusion that GSA, not FHLBB, is the proper agency to conduct long-term, commercial outleasing for FHLBB's quarters is corroborated by the attention which Congress focused on limiting and directing GSA's authority to conduct a commercial outleasing program in the Public Buildings Cooperative Use Act of 1976, Pub.L. 94–541. In that legislation, Congress authorized the Administrator of GSA to execute commercial outleases in federal buildings under its control at rental rates "equivalent to the prevailing commercial rate" in the vicinity and containing such terms and conditions as the Administrator deems necessary "to promote competition and to protect the public interest". 40 U.S.C. § 490(a)(16). No such safeguards are contained in the statute authorizing the construction and operation of FHLBB's quarters. 12 U.S.C. § 1438. *See* Letter of the Comptroller General to John L. Burton, Chairman, Subcommittee on Government Activities and Transportation, Committee on Government Operations, ac-

---

es "violate the integrity of the building", see Letter of November 18, 1977, from Administrator Solomon to FHLBB Chairman McKinney; disputes over cost allocations, see Report by the Comptroller General, October 13, 1978, at 12–14; and, possibly, FHLBB's desire for an annually renewable agreement with GSA, see Letter of November 10, 1977, from Garth Marston to James B. Shea, Commissioner, Public Buildings Services, GSA. The record suggests that FHLBB may have been able to reach an agreement with GSA concerning the outleasing program had it attempted to do so. In his recapitulation of negotiations with Chairman McKinney, Administrator Solomon noted that ". . . I found [the commercial outleasing] of particular interest because of my personal experience in this area and because we are launching a similar program in GSA buildings under the Public Buildings Cooperative Use Act." Letter of November 18, 1977, from Ad-

ministrator Solomon to FHLBB Chairman McKinney.

**3.** That commercial outleasing by government agencies is potentially a very sensitive area is illustrated by plaintiffs' allegations in the present case. If, as plaintiffs allege, the rates charged Crown by FHLBB are below prevailing commercial rates, FHLBB may be, in effect, subsidizing Crown to the apparent detriment of Crown's contiguous competitor, Globe. The damage thus inflicted might constitute a partial taking of Globe's business in violation of the Fifth Amendment either because Globe has not been compensated, *compare United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), or because the taking is not for a public purpose.

companying the October 13, 1978, Report of the Comptroller General, at 3. Thus, the construction of § 1438 urged by FHLBB would give it *carte blanche* with respect to commercial outleasing, which Congress withheld from GSA. The brief mention of FHLBB's authority to use members' contributions for its quarters, including related commercial facilities, in Department of Housing and Urban Development; Space, Science, Veterans and Certain Other Independent Agencies Appropriation Act of 1975 does not remedy this defect since it, too, is silent on the subject of limiting or directing FHLBB's managerial authority.[4] Nor can this cryptic reference to "commercial facilities" in an Appropriation Act contravene the explicit language of 12 U.S.C. § 1438(c)(4) vesting ultimate management and control of FHLBB quarters in GSA, not FHLBB. The Court is not persuaded that Congress intended § 1438 to exempt FHLBB quarters from standards made applicable to commercial outleasing of public buildings under the 1976 Act. The Court therefore rejects the FHLBB contention that it, rather than GSA, is authorized to make long-term commitments for commercial outleasing of its quarters.

6. In view of the foregoing, FHLBB had no authority to enter the 10-year Concession Agreement renewable at Crown's option for an additional 10 years. The agreement is therefore invalid, unless and until it should be ratified by GSA or Congress.

Appendix 1
UNITED STATES OF AMERICA
GENERAL SERVICES ADMINISTRATION
Washington DC 20405

November 18, 1977

Honorable Robert E. McKinney
Chairman
Federal Home Loan Bank Board
Washington, D.C. 20552

---

4. This Act, Pub.L. 93–414, provided:

That the dollar limitation of section 18(c) of the Federal Home Loan Bank Act is further increased by the cumulative assessments and interest-bearing or other advances for purposes thereof, which shall include related commercial facilities, hereby authorized to be required by the Board as non-administrative expenditures of agencies under administration or supervision of the Board or of a body composed of its members, all of which are hereby included in the references therein to agencies under the Board's supervision.

88 Stat. 1095, 1107 (Sept. 6, 1974).

---

Dear Bob:

On August 25, 1977, we met to discuss many matters pertaining to the new headquarters building of the Federal Home Loan Bank Board which the General Services Administration (GSA) has designed and constructed for you.

One of the foremost matters discussed was our shared responsibility to reach mutual agreement for GSA to take over the operation of the building. You will recall that I expressed our willingness in this regard to not only satisfy the obvious intent which Congress expressed in U.S.C. 12 Section 1438, but to fulfill our basic mission to operate buildings of the Federal Government.

During our meeting we presented to you certain areas which we considered extremely important that should not be altered or interfered with for the successful operation of the building. We also reviewed with you the various commitments which have been made to the several interested parties such as the National Capital Planning Commission, the District of Columbia Government, the Advisory Council on Historic Preservation and others in order to obtain the necessary approvals for the project and to counter the considerable criticism the project generated.

Another item was the commercial outleasing involved which I found of particular interest because of my personal experience in this area and because we are launching a similar program in GSA buildings under the Public Buildings Cooperative Use Act.

Almost three months have passed without our completing agreement. More importantly, during that time actions have taken place which violate the integrity of the building along the lines I had previously

expressed as concerns to you. That these have taken place have not only come to me by reports but I have visual evidence through a recent inspection of parts of the building.

On November 13, 1977, we presented to the National Capital Planning Commission a resume of the actions by GSA in conforming to the conditions and recommendations made by the Commission in our final construction of the project.

With the consideration of all these factors I have arrived at the conclusion that not only would it not be to the best interest of GSA to assume operation of the building at this point, but it would be unfair to my people to do so.

I regret that we have not been able to reach agreement but feel that there is no useful purpose in pursuing the matter further.

Sincerely,

(s) JAY SOLOMON
Administrator

### Appendix 2

Federal Home Loan Bank Board
  ROBERT E. McKINNEY, Chairman
  December 2, 1977
  Mr. Jay Solomon, Administrator
  General Services Administration
  Washington, D.C. 20405
  Dear Jay:

Thank you for your letter of November 18, 1977. I was surprised by its conclusion as it was my understanding that our agencies were working productively together to arrive at a mutual agreement regarding our building.

As you know, following our meeting of August 25th in your office, I immediately commissioned our Office of General Counsel and our Office of Administration to review the items which we had discussed. I then wrote to you on September 19th enclosing a memorandum about some of the points and recommended that a committee be set up composed of Mr. Garth Marston, the other Board Member, and a key official of the General Services Administration to resolve any differences

that might exist. I have had regular reports that this committee was meeting and was working toward ultimate solution of the issues involved.

Please be assured that it is my intention to maintain the integrity of this building in accordance with applicable law and regulations. I appreciate your comments concerning this building and have instructed my staff to investigate to the fullest extent possible. It would be helpful if you would share with me any specifics concerning the commercial leases and other matters which come to your attention during your inspection of the building.

I understand that your decision to withdraw from the operation of the building was a difficult one for you to make. We shall abide by your decision. You can be assured that the Bank Board will make every effort to operate this building in a proper and legal manner.

Sincerely,

(s) Bob
Chairman

### JUDGMENT

Plaintiffs' Motion for Summary Judgment was granted in part by Order entered February 9, 1979 for reasons stated in the Memorandum accompanying the Order. Thereafter, pursuant to an Order of February 28, 1979, the United States as *amicus curiae* and the parties submitted memoranda with respect to legal remedies, if any, available to plaintiffs.

The submissions of the *amicus* and the parties reflect a consensus that the plaintiffs have no legal remedy against the defendants now before the Court. The submissions do not establish that plaintiffs are without legal remedy against the United States, *e.g.,* for taking of property without just compensation or for violation of the Federal Tort Claims Act. Plaintiffs have made no claim for damages against any of the defendants. The United States is not a party here. Accordingly, after full consideration of these submissions the Court con-

cludes that plaintiffs are entitled to a Declaratory Judgment, but that their prayer for injunctive relief must be denied because they have failed to establish that they have no plain, prompt, and adequate remedy at law against the United States. In view of this conclusion, judgment will be entered for the plaintiffs. Accordingly, it is this 20th day of March, 1979 hereby

ORDERED, ADJUDGED AND DECREED: That the Federal Home Loan Bank Board Concession Agreement entered into on May 16, 1978 between Federal Home Loan Bank Board and Crown Books Corporation is invalid to the extent that its term extends beyond a common law tenancy by sufferance or month-to-month, unless and until the Concession Agreement may be ratified, either by the General Services Administration or by Congress; and it is

FURTHER ORDERED, ADJUDGED AND DECREED: That a Declaratory Judgment is entered for plaintiffs; and it is

FURTHER ORDERED, ADJUDGED AND DECREED: That plaintiffs' prayer for injunctive relief is DENIED; and it is

FURTHER ORDERED, ADJUDGED AND DECREED: That the Counterclaims of Crown Books Corporation and the plaintiffs are DISMISSED, and the Pretrial Orders are VACATED.